[No. S040575. July 24, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
DELANEY GERAL MARKS, Defendant and Appellant.

202

## COUNSEL

Richard Power, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Dane R. Gillette, Assistant Attorneys General, and Sharon R. Wooden, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—A jury convicted defendant Delaney Geral Marks of two counts of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) and two counts of attempted premeditated murder (§§ 664, 187). With respect to all counts, the jury found true the allegation that defendant personally used a firearm (§ 12022.5). With respect to the attempted murders, the jury found defendant personally inflicted great bodily injury upon the victims (§ 12022.7). It found true the special circumstance allegations that defendant committed multiple murders (§ 190.2, subd. (a)(3)), committed murder in the commission, attempted commission or flight from a robbery (§ 190.2, subd. (a)(17)(A)), and committed murder against a transportation worker (§ 190.25). At a subsequent proceeding, it found beyond a reasonable doubt defendant had suffered four prior felony convictions and served two prior prison terms. The jury set the penalty for the capital crimes at death. The trial court denied defendant's motion to modify the sentence (§ 190.4, subd. (e)). This appeal is automatic (Cal. Const., art. VI, § 11; Pen. Code, § 1239).

For the reasons stated below, we affirm the judgment in its entirety.

## I. FACTS

A. *Guilt Phase*

### 1. *The People's Case*

#### a) *The Taco Bell Shooting*

On October 17, 1990, at approximately 7:30 p.m., defendant entered the Taco Bell on Jackson and 14th Streets in Oakland. He appeared normal to Sherman Boyd, a Taco Bell employee who had seen him on several occasions inside the Taco Bell and elsewhere in the community. The two men acknowledged each other. Defendant ordered two encharitos and Boyd began preparing the order.

Defendant pulled out a gun, pointed it at the head of Taco Bell employee Mui Luong, and fired. As blood flowed from her face, she fell. Defendant did not appear upset or excited; he displayed "no remorse, no feelings whatsoever." It seemed to customer Grace Haynes that defendant acted as if the shooting were "something that is done every day." Defendant quickly left through the restaurant's exit onto Jackson Street, where he walked toward Lake Merritt.

Boyd, Haynes, customer Diane Griffin, and Taco Bell assistant manager Marla Harris all identified defendant in court as the shooter. All four had also selected defendant from a lineup without hesitation.

Mui Luong survived the shooting, but suffered brain damage because the shooting blocked the flow of oxygen and blood to her brain. She also suffered spinal shock, in which the spinal cord "basically . . . shuts down." In the three and one-half years between the shooting and the trial, Luong had never returned home. Her brother visits her at the rehabilitation center and speaks to her, but she never responds, and it appears as if she does not recognize him at all.

#### b) *The Gourmet Market Shootings*

At approximately 7:40 p.m. that same evening, Peter Baeza and John Myers were working, and Denise Frelow was shopping, in the Gourmet Market, a convenience store located on Jackson Street, 795 feet from the Taco Bell. Myers observed a male enter the store but did not pay him any attention. The male raised his arm as if to point to one of the bottles in the liquor section. He fired a gun and Myers fell backwards. Baeza, the store owner, crouched behind the deli cooler, holding a cordless telephone, with

which Myers expected him to call 911. Defendant fired another shot, prompting Baeza to drop the phone, fall to the floor and cough blood. Defendant "breezed out" of the store, "real cool and calm, like nothing had happened . . . ."

Baeza died at the scene. Myers was rushed to the hospital, where he arrived "in shock and in a coma." To save his life, Myers required massive transfusions. Doctors also removed a kidney and a majority of his liver. Myers was released from the hospital on November 9, but continued to suffer sporadic pain.

An autopsy on Baeza revealed the cause of death was a bullet wound to the side of the chest. Forensic evidence further revealed the shooter fired the gun from a distance of approximately 18 inches.

Myers and Frelow testified the shooter was a Black male with braids in his hair; Myers recalled he wore a brown jacket. Both in court and in his October 22, 1990, statement to police, Myers described the shooter as being approximately five feet eight inches tall, with a medium build. Frelow testified the shooter was between five feet six inches and five feet nine inches tall, weighing approximately 155 or 160 pounds. In an earlier statement to police, she described the shooter as being about five feet six or seven inches tall. Defendant's self-described measurements were five feet five inches tall and 150 pounds. On October 22, 1990, Frelow observed a lineup of suspects, from which she selected defendant as the person she thought shot Baeza and Myers, although she was not sure.

c) *The Taxicab Shooting*

Austin Williams, a Nigerian émigré, worked for the same taxicab company as Daniel McDermott. On October 17, 1990, both drivers were lined up at a taxi stand on 13th Street near Broadway in Oakland. A man and a woman walked hurriedly toward Mr. Williams' s taxi; the man went to the front passenger door and the woman went to the rear passenger door. The man was wearing a brown jacket, and the woman was wearing a multicolored dress that had diamond shapes in its pattern. She also had a scar on her face. Williams informed the couple that his was not the next taxi available. The couple then entered McDermott's taxi, which drove them away from the stand.

Susan Yi was living at her parents' home on Eagle Avenue in Alameda. At approximately 8:30 p.m. that night an automobile drove up that she thought might be her father's car but was a yellow taxicab. She saw a Black male standing outside the front passenger door, leaning in, as if paying the driver.

The man was yelling at a woman, whom Yi saw walk away from the taxi. She was Black, heavyset, and wore a multicolored dress. The couple appeared to be boyfriend and girlfriend. A "couple of minutes later" Yi heard what sounded like firecrackers, except louder, coming from the area where the taxicab was parked. She then heard the "skid of tires backing up real fast," and she saw the taxi was moving in reverse very fast.

Robin Menefee had been defendant's girlfriend for about a year. As of October 17, they were living together in the park under a train. Defendant had a .38-caliber gun that he had possessed for a couple of days. That evening, neither had money, so they "panhandled," and then bought beer and wine. As Menefee sat on a platform near Lake Merritt, defendant told her to stay there and wait for him. He returned 30 to 60 minutes later and told her that he had shot two people. He acted "like his normal self."

Menefee accompanied defendant to a taxi stand at 13th and Broadway because she was scared that defendant would shoot her too if she left him. Defendant and Menefee attempted to enter one taxi, but the driver, who had an African accent, told them he was not moving. They then entered McDermott's taxi, with Menefee sitting in back and defendant sitting in front. Defendant and McDermott discussed the World Series game that was being broadcast on the radio at the time. McDermott drove them to a parking lot near Eagle Avenue, where defendant's grandmother lived. Neither defendant nor Menefee had any money to pay for the ride.

When the taxi stopped, defendant told Menefee to leave the taxi. She went into an alley to urinate. She heard a gunshot coming from where the taxi was parked. Defendant ran toward Menefee and told her that he had shot the driver. Defendant continued to act normally. The taxi's horn began honking.

The couple knocked on the door of defendant's grandmother's home, but no one answered. They then hid under an apartment house for about 25 minutes, after which the couple walked to a store and defendant bought some groceries. As they later sat waiting for a bus, police arrested defendant. Menefee has a scar on her cheek.

The autopsy on McDermott revealed he had no injuries indicating any kind of struggle. The cause of death was a bullet wound to the face.

It was McDermott's long-standing habit to bring five $1 bills to work so he could make change. Defendant had seven $1 bills and 43 cents on his person at the time of his arrest; 75 cents but no paper currency was found on McDermott's body. No money was found in the taxi.

Sergeant Mark Landes brought Austin Williams to where defendant was being detained to see whether Williams could identify him. Williams told

Sergeant Landes that defendant looked very similar to the man who attempted to enter his taxi, but he could not be certain. He noted the defendant's skin color and complexion were the same as that of his would-be passenger, and the hairstyle was also very similar, but Williams had not had a good enough look at the man to make a positive identification.

Sergeant Landes retrieved a jacket from the alley near the home of defendant's grandmother. Defendant refused to put on the jacket in court to determine whether it fit. The court instructed the jury it could consider that refusal as reflecting a consciousness of guilt.

### d) *Evidence Pertaining to All Counts*

Sergeant Mark O'Connell of the Alameda Police Department examined defendant's revolver and found there were four expended casings and one live round remaining. Lansing Lee, a criminalist for the Oakland Police Department, examined the revolver found on defendant and the four bullets removed from the bodies of Mui Luong, Peter Baeza, Daniel McDermott, and from the vicinity of John Myers. Lee concluded with "virtually absolute certainty" that the bullets fired at Baeza and Myers came from defendant's gun. Lee's analysis "indicated" the bullet recovered from McDermott came from the gun, and the analysis "suggested" the bullet that injured Luong also came from that source. It was " highly unlikely" that any of the bullets were fired from a gun other than defendant's.

### 2. *Defense Evidence*

Defendant denied shooting anyone at the Taco Bell, the Gourmet Market or in a taxicab on October 17, 1990. Defendant testified he cashed a check for $170 on October 15. He had instructed Robin Menefee never to ask whether he had money; defendant always told people he was broke. When Robin Menefee left defendant's presence, he spent the rest of the evening of October 17 unsuccessfully looking for certain individuals. After his search, he sat on his grandmother's porch, disgusted that she would not answer. Defendant's grandmother, Norah Marks, testified that defendant came by after 10:00 p.m., after which time she does not open her door.

Menefee returned and told defendant that her cousin, Felix Mitchell, wanted to talk to him. Defendant then obtained the gun presented in the People's case. It was the first time in his life he had ever possessed a firearm. He was to transport it to a mystery drug location on High Street for $150. Defendant later bought some groceries on Webster Street for Menefee and himself. They were waiting at a bus stop so defendant could bring the gun to High Street, when police arrested defendant.

Sergeant Mark Landes examined defendant's hands for gunshot residue four hours after the shooting. They were clean. Joseph Fabiny, a criminalist for the Alameda County Sheriff's Department, testified that gunshot residue would more likely be found on someone if he or she had fired four shots instead of one. On May 27, 1991, Fabiny examined the jacket recovered by the People for gunshot residue and found none.

### 3. *Rebuttal*

Sergeant Mark O'Connell interviewed defendant just past midnight on October 18, 1990. Defendant told Sergeant O'Connell he had found the gun a couple of days earlier. Lieutenant Daniel Voznik also questioned defendant in the early morning hours after the shootings. Defendant explained he had found the gun in some bushes on San Pablo Avenue two days prior to the shooting. He did not mention that someone had given it to him to transport in exchange for $150.

Johnny Wemken was working as court bailiff on the afternoon of March 31, 1994. He observed defendant conversing with another inmate charged with murder, Latonya Harris. Harris asked defendant why he was in custody, and defendant answered that " he was in for three murders." When she asked how they died, defendant answered, "I shot them."

### 4. *Surrebuttal*

Harris confirmed some of Bailiff Wemken's testimony. She asked defendant about his charges, and he responded that he was fighting a murder charge. When she asked how they died, he answered, "They got shot." He did not say, "I shot them."

## B. *Penalty Phase*

### 1. *The People's Evidence*

The People presented evidence of specific instances of defendant's misconduct against both civilians and law enforcement officers. The People also presented evidence of the effect of the murders on the families of Daniel McDermott and Peter Baeza.

#### a) *Other Violent Criminal Conduct*

Brenda Bailey grew up with defendant. She was home on December 14, 1978, when defendant visited to use her phone. When he finished his call, he made derogatory comments about Bailey's brothers. After she told defendant

she did not want to hear his comments, he hit her in the head with a telephone. Defendant pulled her from her chair onto the concrete floor, breaking two of her teeth. Defendant then pushed her through the very thick bathroom window. Defendant threw fingernail polish and Comet on her. For this incident, she needed 26 stitches on the inside of her chin and 27 on the outside. Defendant threatened that if she told anyone about the attack, he would put a bomb in her six-year-old son's mouth, cut off her nine-year-old son's head, and kill her mother.

Shirley Hitchens had lived with defendant for about a year. He beat her and stabbed her with a knife, so she ran away, leaving her keys, clothes, furniture, everything. In the early morning hours of January 31, 1982, Hitchens was walking on a street when defendant drove up and told her to get in his car. She refused because she was scared. She ran and told Bobby Jones, who approached defendant's car. Defendant tried to grab Hitchens, but Jones intervened. Witness Jeff Heilbronner saw defendant holding a knife, chasing another man around a car. Someone shouted that the police were coming, and defendant jumped into his car and put it in reverse. Officer Terry Lewis grabbed Bobby Jones, and they fell to the ground. Police officers twice ordered defendant to exit and not start his car, but defendant began driving backwards. The officers warned defendant that there were people behind him. Defendant drove over both Jones and Officer Lewis. If defendant had driven straight backwards, he would have driven over Officer Lewis's lower leg. Instead, defendant turned the wheels so the car drove over the officer's lower back. Officer Lewis suffered bruises when the car pinned his arms against the street.

On December 24, 1988, Jim Payne and his son Trent went to a 7-Eleven store to rent a movie. When the father pulled out money to pay, defendant grabbed about $400 to $500. Defendant knocked Payne to the ground and bloodied his nose.

The People also described several instances of defendant's violent criminal conduct inside correctional facilities. On February 4, 1989, Alameda County Deputy Sheriff Greg Breslin heard a loud banging noise coming from defendant's cell in the North County Jail. When Deputy Breslin investigated, defendant told him, "I didn't kick the cell, and fuck you." Defendant adopted a "karate stance" and challenged Deputy Breslin to fight. Deputy Breslin left the cell and returned with another deputy, when defendant lunged at Deputy Breslin. Defendant bit him and punched him in the groin. Defendant taunted Deputy Breslin, "I bit you and punched you in the balls. How does it feel, punk?" Deputy Breslin recalled defendant bragged, "I bit him real good. And I remember he cried out like a bitch."

On January 19, 1986, James Hewitt was serving as watch commander of California Men's Colony West Facility at San Luis Obispo. Defendant, as part of a group of Black inmates, approached another inmate named Herzog and struck him in the nose. Such interracial assaults are a special concern to prison security personnel.

On March 28, 1989, defendant kicked backward karate-style at Deputy Jones, who was transporting him in an elevator at North County Jail. When defendant and the deputies escorting him arrived at their destination, Deputy Jones removed defendant's handcuffs. Defendant put his foot on the wall and drove himself backward into Deputy Jones.

On October 1, 1990, when confined at Santa Rita Jail, defendant asked Deputy Sheriff Sebastian Tine for toilet paper and a razor for shaving. Deputy Tine tucked the razor blade inside the paper and gave them to defendant. When Deputy Tine was distracted, defendant struck him in the face, drawing blood and knocking off his glasses.

On November 6, 1992, defendant was sitting in a courtroom, with his arms shackled. When his attorney Joseph Najpaver entered the room, defendant "bolted" from his chair and began kicking Najpaver in the groin and waist area very fast, at least five times. Najpaver was defendant's attorney from October 30, 1990, until shortly after the November 6 attack.

b) *Impact on Survivors*

Jacqulin Le Gree was Daniel McDermott's older daughter. He always was kind and loving, and went out of his way to help strangers. He was never violent or angry. Le Gree would have been able to handle her father's death better if it had occurred through natural causes ·or an accident, rather than defendant's purposeful act. Le Gree feels the loss most painfully when her children tell her they do not remember their grandfather.

Ingrid Page was Daniel McDermott's younger daughter. She last saw her father as she was preparing to go to Germany as part of her military service. She could not understand why anyone would want to kill her father, who had never done anything to anybody. Initially, the hardest aspect of her father's death was its unnatural cause. Now the hardest part was that her father never had the chance to meet her husband or her daughter.

Thomas Carter was an employee of Peter Baeza's. Until he met Baeza, no one would give Carter a job because of his seizure disorder. Baeza treated Carter as a human being, when other people did not, and helped him obtain disability payments for the disorder. He treated Carter like a son. Carter's

seizures had almost disappeared due to Baeza's assistance. Since Baeza's death, however, Carter has lost his job and has been unable to find another. Carter's physical condition then deteriorated, and his fiancée left him. Baeza often extended credit to the elderly of the neighborhood and was kind to everybody.

Carmen Baeza Waller, Peter Baeza's daughter, described her father as a "class act, a gentleman." He taught her about her Chilean heritage and that males can be gentle. She looked for someone like her father when she was ready to get married. The most difficult part of her father's passing was the look in her mother's eyes when she learned her husband of 39 years was dead. After the funeral, the family brought a collage of photographs from Baeza's life to his widow's home. Carmen Waller's four-year-old son moved all his toys next to the collage and explained, "I just wanted to play with Poppo, like we used to."

Peter Baeza' s memorial service was standing-room only. People whom the family did not know approached them and described Baeza's acts of kindness. Many elderly people who could not attend wrote letters and cards. It would have been easier for Waller to accept her father's death if it had been the result of poor health. She wonders what it will be like for her children to grow up without their grandfather.

Fanny Baeza met her future husband when she was nine years old and he was seven. They immigrated to the United States from Chile on Easter Sunday, 1962, with their two children, whom they hoped to raise in a better environment. Baeza worked as an aircraft mechanic until he bought the Gourmet Market in 1972. Fanny Baeza worked as a public health nurse until her retirement in 1985, when she was supervising nearly 100 other nurses. Peter Baeza was responsible, honest, and trustworthy. He was a good father, a good husband, and a good provider. Fanny Baeza was recovering from breast cancer when her husband was murdered.

When Ms. Baeza lost her husband, she lost everything. With her children grown and moved out, all she had was her husband for company. She suffered financially, as there was little insurance, and nothing remained after probate. She had to sell her home and begin working again. Since the murder, she wakes up every morning at 3:15 a.m., the time when she learned of her husband's death from a telephone call. Peter Baeza used to call his wife four or five times a day to tell her how much he loved her. After his death, however, she has become very lonely, as there is "nobody to call me, nobody to share my day with, nobody to hear how his day was. Just me."

Peter Baeza taught his son Charles a work ethic and politeness. Although the family initially came together after his death, they have since grown

further apart. The financial impact of Peter Baeza's death was devastating. There was not enough money in the estate even to pay for the funeral. When Charles and Fanny Baeza visited the store after the murder, people thanked them for letting Peter Baeza be a part of their lives. One woman told Charles how she moved to the neighborhood, fleeing her former husband. She had a young son and no money. Peter Baeza extended her credit until she got a job. She eventually became successful, and stated she never would have made it but for Peter Baeza's generosity and faith in her. As Charles Baeza summarized, "This is not a regular guy. There is nobody like him. There never will be . . . . I'll live my life trying to be like him."

### 2. *Defense Evidence*

Defendant testified, and presented several witnesses who described his background. Defendant's own testimony covered both the general circumstances of his life and the specific incidents raised by the People's penalty phase evidence.

#### a) *Background*

##### (1) *Defendant's Testimony*

Defendant was the oldest child in a family of six. His father worked in construction, and his mother worked for the phone company and then at different schools. He joined the Navy in 1974 when he was 18, and left two years later. He received money to continue his education from the government, but he did not do any work because he did not want to. He began working as a receptionist in 1978 when his girlfriend was pregnant. For the next decade, defendant alternated among various odd jobs and prison.

After an October 1988 bus accident, defendant began suffering epileptic seizures. His condition was aggravated when he learned of his mother's death. He was in prison and unable to attend the funeral. No one in his family told defendant for four months because they thought it would affect him and his participation in prison programs. Defendant was receiving medication for seizures at the time of the shootings.

Defendant regretted that his father never gave him a "father-son" talk about the importance of staying in school. His father was jealous that defendant earned his high school diploma at age 16, whereas he did not obtain one until he was 40.

##### (2) *Other Witnesses*

Several other witnesses testified at the penalty phase, including defendant's daughter Relisha Marks, his sister Elaine Marks Bell, his aunt Bobbie Jane

Redic, his cousin Lorraine Winn, his brother Damon Marks, and three women who had known defendant since his childhood or birth, Reverend Betty Williams, Effie Jones, and Willoris Childs, the grandmother of defendant's daughter. They presented mostly consistent testimony that described defendant as having grown up in a good family environment with religion, where there was no drug or alcohol abuse, no domestic violence, and with a father who encouraged education and hard work. Defendant was helpful to his family as a child. He had no more problems than the average child and was never in serious trouble.

Defendant's problems began after his discharge from the Navy, where he "lost himself" through drugs. "[I]t seem[ed] as if there had been [a] deterioration in [defendant's] thought processes," as defendant was "talking off the wall." Defendant's father disapproved of defendant's drug use, but defendant refused to listen to his father's advice. Because of defendant's trouble, his father did not want him at the family home, at the home of defendant's grandmother, or at the funeral of defendant's mother. Defendant had a close relationship with his mother, and his inability to attend her funeral may have contributed to his problems.

Defendant never hit his daughter (age 15 when she testified), or anyone else in her presence. She never saw him intoxicated and never had any problems with him. When he was not in prison, she saw him once or twice a week.

b) *Other Violent Criminal Conduct*

Defendant testified regarding the specific examples of misconduct described in the People's case. Defendant admitted he had four prior convictions, but asserted he had been falsely convicted. He claimed Shirley Hitchens wanted to enter his car, and Bobby Jones was the one with a knife chasing defendant. He did not think he ran over Officer Lewis, but if he did, it was an accident that happened as he fled for his life. Defendant punched Brenda Bailey in the face only after she had tried (unsuccessfully) to throw hot chicken grease in his face. Defendant protected himself against Jim Payne's "tak[ing] the law into his own hands," although defendant admitted he was wrong in taking Payne's money. He never hit Payne with his hands.

Defendant explained that he did not attack Deputy Breslin. Defendant had been reading his Bible when the deputy called him a "son of a bitch." Defendant said, "You are the same punk motherfucker [who] called my mother a bitch. Fuck you." Deputy Breslin then came running at defendant. Defendant punched Deputy Breslin in the groin. Defendant slapped him around, but Deputy Breslin and another deputy hit defendant in the groin, and then they all started laughing.

Defendant did not kick Deputy Jones, who had been shoving defendant. Defendant punched him, and told him, "I'm just a person, all you got to do is ask me, and I'll move." Defendant struck Deputy Tine because the deputy harassed him with racial remarks and threw away his book about the prosecution and execution of Julius and Ethel Rosenberg. Defendant attacked inmate Herzog after Herzog jumped him. Defendant initially ran away, but realized he had to fight back, so he did.

Defendant admitted kicking his attorney, Joseph Najpaver. Defendant wanted different counsel because Najpaver told him to plead guilty and accept a sentence of life imprisonment, and did not gather evidence to show defendant was innocent. Defendant planned the attack to secure new counsel. "I knew [if] it was a verbal conflict that wouldn't grant me justice, but . . . if it's physical and verbal he has to be removed . . . . I knew I had to make contact to get rid of him."

### 3. *Rebuttal*

Deputy Sheriff Rachael Lauricella obtained a statement from defendant after his attack on Deputy Tine. The two men often exchanged insults. After defendant stated, "I'll hit you upside your motherfucking head if you disrespect me," Deputy Tine then remarked, "I'll make that son of a bitch regret the day he ever lived." When defendant asked about Deputy Tine's accusation that defendant was a cell soldier[1] hiding in administrative segregation, Deputy Tine repeated the accusation, so defendant hit him. Defendant did not tell Deputy Lauricella that Deputy Tine had used any racial epithets.

### 4. *Surrebuttal*

Defendant agreed that he made the statement to Deputy Lauricella, but asserted that Deputy Tine had engaged in racial slander for several weeks. Defendant completed a grievance form against Deputy Tine, who tore it up in defendant's face.

## II. DISCUSSION

### A. *Competency Issues*

#### 1. *Sufficiency of the Evidence*

Defendant contends the jury erred in finding him competent to stand trial, thereby depriving him of due process under both the Fourteenth Amendment

---

[1] Deputy Lauricella explained the term was an insult that described someone who talked big behind his cell door but did not back up that talk when the door was open.

to the United States Constitution and article I, section 15 of the California Constitution. ■ A defendant is incompetent if "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) The defendant has the burden of proving incompetency by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Marshall* (1997) 15 Cal.4th 1, 31 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*).) An appellate court reviews the record in the light most favorable to the jury's determination. (*Ibid.*) We conclude that substantial evidence supports the jury's competency finding. We further find the trial court properly declined to order a subsequent competency hearing.

### a) *Facts*

The defense presented several witnesses to establish defendant's incompetence to stand trial. Joseph Najpaver, defendant's initial attorney, testified that defendant started out as a cooperative client. But defendant often interrupted the preliminary hearing proceedings. Defendant wished to have a different attorney represent him because he believed that Najpaver thought he was guilty. Defendant brought four *Marsden*[2] motions to obtain new counsel, during which defendant asserted Najpaver had called him a "nigger," which Najpaver had not. Defendant complained that Najpaver and Cocounsel Joseph McGrew "have tried to con . . . or manipulate me to take life sentences for something I did not do." Najpaver had tried to negotiate a plea through which defendant could receive a sentence of life imprisonment without possibility of parole. Defendant became very angry during the preliminary hearing when his former girlfriend provided damaging testimony.

Judge George Nelson presided over defendant's preliminary hearing. During the hearing, the prosecutor tried to photograph defendant, but defendant tried to keep his eyes closed, which gave a distorted picture of his face. Judge Nelson considered this a rational act because it would prevent the prosecution from developing an accurate photograph. Considering defendant's overall behavior during the hearing, however, Judge Nelson concluded defendant "was acting out in a manner prejudicial to his case," by distracting his attorney and influencing his former girlfriend during her testimony. Defendant did not act out that way when police officers testified.

Dr. James Anderson's stipulated testimony was that all defendants found incompetent to stand trial go to Atascadero State Hospital. Dr. John Riley, a psychologist there, testified that the hospital has a trial competency program that attempts to restore defendants to competency so they can stand trial. Of

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

those defendants who come to the hospital, 90 percent return to stand trial, and 93 percent of those complete the trial process. Defendants may stay at Atascadero State Hospital beyond three years if they have committed a serious felony involving great bodily injury or the threat of it and remain incompetent and dangerous. One defendant remained for 12 years until he was deemed competent to stand trial.

Dr. Fred Rosenthal examined defendant on February 24, 1992. Dr. Rosenthal concluded defendant was not competent to stand trial, basing this conclusion mostly on descriptions of his behavior "by a number of people over the years." Dr. Rosenthal opined that defendant did not understand the nature of the charges against him, because defendant indicated the charges concerned only the possession of a weapon. Defendant was cooperative with Dr. Rosenthal, although defendant's comments occasionally went off on tangents. Dr. Rosenthal considered defendant paranoid because he believed his attorney had made a deal with the district attorney to convict him and there was thus no chance of defendant's "getting any kind of trial." On cross-examination, Dr. Rosenthal stated that if he himself were a defendant who maintained his innocence, and his counsel sought to have him plead guilty and receive a sentence of life imprisonment without possibility of parole, he would take steps to find a different attorney. Dr. Rosenthal did not know that defendant had attempted to do so on four separate occasions.

Josalyn Harris, a mental health counselor at North County and Santa Rita Jails, saw defendant every week or two from October 1990 to June 1992. He complained to her about the collusion between the district attorney and the public defender. Defendant trusted Susan Sawyer (his attorney for the competency hearing) and thus cooperated with her. Defendant was aware of the possibility that he might be sentenced to death.

Deputy Sheriff Richard Quinn worked at Santa Rita Jail and conducted weekly reviews of defendant. Deputy Quinn often recommended that defendant be housed in administrative segregation or isolation. Defendant wished to remain segregated from the rest of the jail; he indicated he had received threats from other inmates. Defendant made excuses to remain segregated. He once stated that if moved, he would have "disciplinary problems," which Deputy Quinn interpreted to mean he might assault staff, other inmates, and generally refuse to "go[] along with the program of the jail." On one occasion, Deputy Quinn wrote, "I believe that [defendant] is just hiding from the rest of the jail. He does seem to have some mental problems, remain A[dministration] I[solation]." Deputy Quinn believed defendant was competent to stand trial.

Dr. Karen Gudiksen worked as a psychiatrist at the Santa Rita Jail. She had examined approximately 250 people for competency over 20 years and found

most of them incompetent. She examined defendant in February 1992, in March 1992, and in July 1992. She concluded he was not competent to stand trial, basing that on defendant's disorganized speech and bizarre descriptions of physical ailments. Defendant paused during the interview, as if he were hearing voices. In determining defendant's incompetency, Dr. Gudiksen also relied on his history, which was provided by defendant personally and Attorney Najpaver. Dr. Gudiksen's report stated defendant "goes on and on . . . about discrepancies between his appearance and that described by some of the witnesses." Dr. Gudiksen had not read the preliminary hearing transcript, and thus did not know whether defendant's point was valid.

Francis McGrew was cocounsel with Najpaver, who was the lead attorney. During the preliminary hearing, defendant talked to himself, laughed inappropriately, and made objections. Robin Menefee's testimony "set him off." He remarked, "That's not true. She's got a plate in her head. She doesn't know what she's talking about. She's not a good witness."

Dr. David Stein, a clinical psychologist, administered neuropsychological tests to defendant. Defendant had impaired motor skills. Defendant also had difficulty sequencing material. It took him 170 seconds to complete a project connecting dots, which the average person completes in 15 to 30 seconds. He was also unable to copy shapes and figures accurately. Defendant could count backwards from 20 and could correctly multiply four times three in his head, but needed to use his fingers to multiply eight times six. He correctly recited the alphabet, although he added the letter "u" after "q." He correctly identified the President of the United States and his predecessor, and the Governor of California. Based on personal observations and the records he reviewed, Dr. Stein concluded defendant had emotional and organic problems.

The People presented three witnesses. Holly Lasalle, an accounting supervisor at Santa Rita Jail, testified that prison records reflected defendant never spent more money at the prison commissary than he had remaining in his account. However, she admitted that the records would not reflect any activity if defendant attempted to make a purchase with insufficient funds. Sergeant Harvey Lewis testified that defendant completed paperwork requesting legal materials. Deputy Sheriff Timothy Durbin, a classification officer at Santa Rita Jail, was responsible for the assignment of inmates. In June 1992, defendant asked Deputy Durbin for a work assignment. Defendant believed that if he had a job it would look better to the jury in his upcoming trial. Defendant told Deputy Durbin that he was rejecting an invitation to appear on the television program America's Most Wanted because his attorney had advised him that it was not in his best interests, as he might "trip himself up." Defendant stated he would have a competency hearing soon. Deputy Durbin

asked whether that was a hearing to decide whether defendant could fire his attorney, and defendant responded, "No, it is a competency hearing to see whether or not I am sane." Defendant added, "I should lose that in June and I'll start my main trial later in the year or early '93."

In rebuttal, the defense called Dr. Jules Burstein, a clinical and forensic psychologist. Dr. Burstein had examined approximately 100 individuals for competency over the past 11 years, and found approximately 60 to 70 percent of them incompetent. He had examined defendant for competency in 1989 regarding a prior case. At that time, Dr. Burstein concluded defendant was competent to stand trial, as he understood the nature of the charges "only too well," and that although his former attorney might have believed defendant was incapable of co operating with him, Dr. Burstein believed defendant did not wish to cooperate. Dr. Burstein had recorded defendant as a malingerer, someone who acts crazy to stop judicial proceedings against him. In July 1992, however, Dr. Burstein examined defendant and determined he was not competent, although defendant did know with which offenses he was charged. Defendant told Dr. Burstein that "he got along fine" with his new attorney, Susan Sawyer. Before the 1992 examination, Attorney Sawyer informed Dr. Burstein of the conclusions of both Dr. Rosenthal and Dr. Gudiksen, with whom Dr. Burstein had become acquainted in 1977. Dr. Burstein was perplexed by Attorney Sawyer's invitation to examine defendant, because the determination of incompetency by two doctors is usually sufficient. In explaining the change in his assessment of defendant from 1989 to 1992, Dr. Burstein noted that the clinician in 1989 found defendant nonpsychotic, whereas in 1992, Joslyn Harris, whose reputation as a clinician Dr. Burstein respected, found defendant psychotic.

The jury determined defendant was competent to stand trial. The defense moved for a judgment notwithstanding the verdict. The court denied the motion, observing that Deputy Durbin's testimony alone provided substantial evidence of defendant's competency.

### b) *Discussion*

Defendant contends insufficient evidence supports the jury's finding.[3] He relies on *People v. Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485] (*Samuel*), where the defense "presented an impressive array of evidence" demonstrating incompetence. (*Id.* at p. 497.) We further found that

---

[3] Although defendant cites evidence developed during the guilt and penalty phases, our review is limited to the evidence before the court at the time of the competency hearing. (See *People v. Welch* (1999) 20 Cal.4th 701, 739 [85 Cal.Rptr.2d 203, 976 P.2d 754] [trial court's decision not to declare doubt as to defendant's competency cannot be challenged on appeal by reference to subsequently produced evidence].)

neither of the People's witnesses contradicted any of the defense testimony. (*Id.* at p. 498.) We find *Samuel* distinguishable from this case.

First, the defense evidence was not compelling. Although the defense presented expert testimony, the People's cross-examination called into question the reliability of the experts' analyses. As we have explained, expert testimony is only as reliable as its bases (*Marshall, supra,* 15 Cal.4th at p. 32), and here they were suspect. Dr. Gudiksen's information about defendant's history was limited to that which she received from defense counsel and her meetings with defendant. Dr. Burstein acknowledged he was familiar with the determinations of the other experts (one of whom was an acquaintance) before examining defendant for himself. Dr. Burstein also justified his opinion by citing the opinion of another witness.

Furthermore, the defense experts who considered defendant incompetent were unfamiliar with much of the evidence that tended to render defendant's behavior comprehensible. Dr. Rosenthal concluded defendant was paranoid and unrealistic about the proceedings because defendant was convinced his attorney and the district attorney had made a deal to convict him so he would not get a trial. But Attorney Najpaver had in fact attempted to conclude a plea agreement with the district attorney, which would have generated a conviction without a trial. Dr. Rosenthal testified that if his own attorney had tried to have him plead guilty for a sentence of life imprisonment without possibility of parole even though he maintained his innocence, he himself would seek new counsel. Dr. Rosenthal did not know that defendant had tried to do so on four separate occasions. Similarly, Dr. Gudiksen's report stated defendant "goes on and on . . . about discrepancies between his appearance and that described by some of the witnesses." Dr. Gudiksen assumed that this repetition indicated that defendant was not "focusing on the issues," but she had not read the preliminary hearing transcript, and thus did not know whether defendant's concern was a legitimate criticism of the People's case against him.

Second, and more importantly, whereas the prosecution in *Samuel* failed to contradict any of the defense testimony (*Samuel, supra,* 29 Cal.3d at p. 498), the People below produced abundant evidence that contradicted the defense testimony, most of it coming from defendant's own mouth. For example, although Dr. Rosenthal opined that defendant believed the charge concerned only possession of a weapon, defendant himself remarked, "I didn't do no Taco Bell shootings and no Gourmet shootings, and no cab shootings." Defendant's statements support the inference that he fully recognized the magnitude of the charges he faced and the potential consequences, as well as counsel's unwillingness to seek an acquittal. "And this is a life or death, either I get life or I get death. It's just cut and dry. Either you get life or you

get death, and here are two people playing with your life. I need somebody who is serious that want to see me victorious . . . ." Defendant objected to the fact that Attorneys Najpaver and McGrew "tried to . . . manipulate me to take life sentences for something I did not do." At one *Marsden* hearing, defendant told the court, "I want a public defender . . . who I can work with, understand me . . . . I know I can't pick my own lawyer, but I'm saying if there is a conflict and my life is at stake . . . . I can't get my rights with the counsel who don't believe I'm innocent. He don't believe I'm innocent, and he's addressed me as such." Defendant also indicated he understood the nature of the competency hearing: "[I]t is a competency hearing to see whether or not I am sane."

Defendant's statements and conduct further showed he could assist counsel in the conduct of the defense. Although he did not cooperate with the attorney who was trying to arrange defendant's conviction for noncapital murder, he cooperated with Attorney Sawyer because he trusted her. He took her advice not to appear on television and he sought work to make a good impression on the jury. Defendant thus showed he *was able* to cooperate with counsel but sometimes *refused* to do so, largely to achieve a substitution of counsel. In an earlier proceeding described during the instant hearing, defendant remarked, "I know I acted like a zip-down fool in the courtroom. I don't want Mr. Denton as my attorney and I will not cooperate. with him." Defendant promised to cooperate and refrain from acting like a "zip-down fool" if he were granted a new attorney.

■ Furthermore, although defendant's outbursts did not comport with courtroom protocol, they did reflect his attempt to provide advice to counsel. For example, defendant complained that counsel failed to ask a witness who claimed to have been five feet from the smiling perpetrator whether there was anything unusual about the perpetrator's teeth, as defendant had missing teeth. We conclude there was substantial evidence from which the jury could rationally infer defendant's competence to stand trial.

Defendant further contends that his conduct during trial warranted a further examination of his competency, and the trial court erred in failing to suspend the proceedings. ■ However, once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry. (*Marshall, supra,* 15 Cal.4th at p. 33.) Reviewing courts give great deference to a trial court's decision whether to hold a competency hearing. " ' "An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." ' " (*Ibid.,* quoting *People v. Danielson* (1992) 3 Cal.4th 691, 727 [13 Cal.Rptr.2d 1, 838 P.2d 729], disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618] (*Price*).)

Moreover, defendant's most conspicuous outburst during trial amply proves his ability to understand the proceedings and assist counsel. When the prosecutor concluded his redirect examination of John Myers, defendant interrupted, "Your Honor, I object. This person stated it was not me, it was No. 6 who committed the shooting . . . . He did not even ask." Discussion among the attorneys and the court revealed that Myers had selected a suspect other than defendant at a photographic lineup. The prosecutor recognized, however, there was a sound tactical reason for defense counsel's not asking Myers about his failure to select defendant: Myers had indicated "it was a toss up" between defendant and the "number six" individual; Myers finally chose the latter. Although there was a legitimate reason for not asking Myers about his selection at the lineup, defendant's comment reflected he comprehended not just the nature of the proceedings but the state of the People's case and its potential deficiencies. Defendant also demonstrated his ability to offer assistance to counsel, even if such assistance was neither solicited nor welcomed.[4]

Defendant was properly found competent to stand trial.

### 2. *Defendant's Requested Instruction*

Defendant requested the following special instruction: "If the defendant is found mentally competent to stand trial, criminal proceedings will immediately be resumed and the trial on the offense charged shall be held in the normal course of the court's business. [¶] If the defendant is found mentally incompetent to stand trial, criminal proceedings shall remain suspended until such time as he becomes mentally competent. In the meantime, the court will order the defendant to be confined at a state hospital for the care and treatment of the mentally disordered where he will participate in a program designed to promote the defendant's speedy restoration to mental competence." The trial court refused to read the instruction. The court stated that Dr. Riley's testimony regarding Atascadero State Hospital had already provided the jury with this information, although the court expressed an inclination to instruct if the jury were confused about the issue. Defendant contends the court erred in failing to read the instruction, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7, 15, and 17 of the California Constitution. We find no error.

---

[4] The defense again moved for a competency hearing after defendant testified in the guilt phase. The motion was based in large part on defendant's frequent nonresponsiveness to the questions posed. As the trial court found, however, defendant strategically ignored the limited scope of questions and aggressively presented to the jury material that would either tend to raise a doubt about his guilt or engender sympathy for him. The court considered this "an intentional and volitional and willful decision by him to go outside the scope of questions and place material before the jury that he perceived to be in his interests."

The defendant based the request on *People v. Moore* (1985) 166 Cal.App.3d 540 [211 Cal.Rptr. 856] *(Moore)*. *Moore* held that a defendant in a sanity proceeding is entitled upon request to an instruction that a finding of not guilty by reason of insanity does not entitle the defendant to immediate release as would an ordinary acquittal. We explained the instruction was designed to preclude the possibility that jurors would find the defendant sane simply because they perceived no other way to prevent him from returning to the community. (See *People v. Kelly* (1992) 1 Cal.4th 495, 538 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Defendant argues the jury likewise might have found defendant competent simply to prevent his permanent immunity from punishment.

The requested instruction, however, characterized defendant's return to competence and the eventual resumption of criminal proceedings as inevitable. Notwithstanding the hospital's attempt "to promote the defendant's speedy restoration to mental competence," there was no guarantee of a speedy recovery, and the instruction was therefore flawed. Furthermore, we have declined to extend *Moore* beyond its original context. (*People v. Thomas* (1992) 2 Cal.4th 489, 539 [7 Cal.Rptr.2d 199, 828 P.2d 101].) ▌ Finally, because the proposed instruction is not constitutionally based, its erroneous omission does not warrant reversal unless a different result would have been reasonably probable, which is not the case. (See *People v. Young* (1987) 189 Cal.App.3d 891, 916 [234 Cal.Rptr. 819] [failure to read *Moore* instruction reviewed for prejudice under standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] *(Watson)*].)

B. *Guilt Phase*

1. *Courtroom Security*

Defendant contends the trial court erred in placing a deputy sheriff next to him during his testimony. He contends this error deprived him of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, and 17 of the California Constitution. We find no error.

Prior to the start of trial, defense counsel requested that defendant be subject to physical restraints in the courtroom. One defense attorney expressed fear that defendant might injure him during trial; the other attorney indicated he was concerned not with defendant's injuring him but with defendant's harming his defense by misconduct before the jury. The trial court declined to impose the restraints, concluding the record before it failed to establish the "manifest need" required by *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322] *(Duran)* for the restraints.

The proximity of the witness stand to the jury box prompted the court to revisit the issue once defendant was about to testify. The court proposed two alternatives: defendant could testify from his position at counsel's table or he could testify from the witness stand with a marshal sitting next to him, facing him. The court recalled defendant's history, which included assaulting an attorney in court and a deputy sheriff during this case. After a break, defense counsel indicated that defendant wished to testify from the witness chair. The court explained it would position a marshal in a chair next to defendant on the raised platform that was parallel to Juror No. 7.[5] The court recalled defendant's prior assaultive behavior, his violation of court orders, and his being removed from the courtroom for being verbally disruptive earlier in the trial. The court noted that the jury box was only four feet from where defendant would sit, and it would be "total dereliction of [the court's] responsibility" to have the nearest marshal "some 30 or 40 feet away, who would have to go around tables, chairs and other people [to] get to [defendant]."

The court read the following admonition, at the defense's request: "With respect to the position of Deputy Scott, you'll observe that Deputy Scott is seated up next to the jury box. [¶] First of all, let me indicate to you that you are not to speculate as to the reasons why Deputy Scott is in this position, nor are you to let it become part of your deliberations or your conclusions in this case in any way. This is a perfectly normal procedure, and you should not draw any adverse [inferences] from this of any kind."

Defendant cites *Duran* for the proposition that there must be a "manifest need" for the placement of the marshal so close to him as he testified. *Duran* imposed the manifest need standard for the use of *physical restraints*. (*Duran, supra,* 16 Cal.3d at pp. 290–291.) *Duran* expressly distinguished such shackling from monitoring by security personnel. "We are not here concerned with the use of armed guards in the courtroom. Unless they are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor." (*Duran,* at p. 291, fn. 8.) The *Duran* holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to *People v. David* (1939) 12 Cal.2d 639, 644 [86 P.2d 811], where a deputy drew up his chair immediately behind where the defendant was sitting. (See *Duran,* at p. 291, fn. 8.) The distinction between shackling and monitoring is long-standing. The *David* court distinguished that case's deployment of security personnel with the physical restraints that caused prejudice in *People v. Harrington* (1871) 42 Cal. 165. (*People v. David, supra,* 12 Cal.2d at p. 644.) *Harrington* was the primary authority on which *Duran* relied, and its reasoning indicates that courtroom

---

[5] It appears that the marshal sat four or five feet from defendant's side (facing his ear) next to and slightly behind Juror No. 7.

monitoring by security personnel does not necessarily create the prejudice created by shackling. " '[A]ny . . . *physical burdens, pains and restraints* upon a prisoner during the progress of his trial, inevitably tends to *confuse and embarrass his mental faculties,* and thereby materially to abridge and prejudicially affect his constitutional rights of defense; and especially would such physical bonds and restraints in like manner materially impair and prejudicially affect his statutory privilege of becoming a competent witness and testifying in his own behalf.' " (*Duran, supra,* 16 Cal.3d at p. 288, italics added, quoting *Harrington, supra,* at p. 168.) The United States Supreme Court has likewise refused to find the "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial [as] the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest . . . ." (*Holbrook v. Flynn* (1986) 475 U.S. 560, 568–569 [89 L.Ed.2d 525, 106 S.Ct. 1340].) *Holbrook* observed, "While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, . . . it is entirely possible that jurors will not infer anything at all from the presence of the guards . . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." (*Id.* at p. 569.)

We therefore maintain this distinction between shackling and the deployment of security personnel, and decline to impose the manifest need standard for the deployment of marshals inside the courtroom. (*Duran, supra,* 16 Cal.3d at p. 291, fn. 8.)

Defendant now claims the trial court should have had him testify bound by restraints not visible to the jury. Defendant never asserted there was a less intrusive means of securing the courtroom, and his failure to object now bars the instant claim that through invisible shackling the court could have achieved the same security benefit with less prejudice to defendant. (See *Duran, supra,* 16 Cal.3d at p. 289 [failure to object to restraint waives claim].) Furthermore, as indicated above, physical restraints may well be more distracting and disorienting to a testifying defendant than a security guard's presence four or five feet away, next to (and slightly behind) the jurors.

Defendant had attacked his own counsel in the courtroom, and his disruptive behavior and violations of court orders had led to his removal at one point. The court observed the proximity of the witness stand to the jury box, and reasonably concluded it would be irresponsible to leave the jury unprotected from a capital defendant with a record of violent behavior in the courtroom. Under any standard of review, the trial court properly exercised its discretion in securing the courtroom.

## 2. *Visual Exhibits*

Defendant contends the trial court erred in admitting over his objection both a videotape depicting Mui Luong's daily activities and photographs of the crime scenes and victims. He alleges a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and sections 7, 15, and 17 of article I of the California Constitution. We find no reversible error.

### a) *The Videotape*

The People offered into evidence a videotape depicting a typical day for Mui Luong. The tape shows her receiving physical therapy, with accompanying explanations from the attending medical personnel. The defense objected to the tape as being unduly prejudicial under Evidence Code section 352. The defense argued the tape "does not show great bodily injury. It shows the results of great bodily injury." Insofar as the People offered the tape to prove the great bodily injury allegation, defendant insisted the People should be compelled to accept the defense's stipulation that Luong suffered the requisite injury.

The court overruled the objection. The court considered the contrast between great bodily injury and the results of great bodily injury as "a distinction without a difference." The court found the videotape was "certainly not" "inherently inflammatory." The court noted "[t]he tape is approximately 36 to 37 minutes long, it depicts for—very nearly all [*sic*] what's on the tape is a picture of the victim, Mui Luong, either lying in bed or being transported to a wheelchair or to a special table and then back again or having a therapist manipulate her limbs. There is nothing about this which in any way, in my view, is inherently inflammatory. There is no blood visible, although that is certainly not dispositive, there is no indication of overt signs of pain or suffering on the part of the victim."

The trial court quoted some of our analyses in explaining its decision to allow the People to use the videotape to prove the allegation rather than accept the defense's offer of a stipulation. The court recalled we upheld the admission of allegedly prejudicial videotape and photographic evidence in *People v. Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887]. "The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory of murder . . . ." (*Id.* at p. 706.) Likewise, the court recalled the "strong policy against depriving the state's case of its persuasiveness and forcefulness by forcing the

prosecutor to accept stipulations that soften the impact of the evidence in its entirety." (*People v. McClellan* (1969) 71 Cal.2d 793, 802 [80 Cal.Rptr. 31, 457 P.2d 871].)

We have upheld the admission of a photograph of a "bloodied, lifeless body" to "establish that a murder had occurred." (*People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748] (*Scheid*).) We observed in *Scheid* that the existence of other evidence establishing that fact did not compel the evidence's exclusion. (*Ibid.*) ■ We reiterated the rule that a prosecutor is not obligated " ' "to accept antiseptic stipulations in lieu of [visual] evidence." ' " (*Id.* at p. 16, quoting *People v. Crittenden* (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The People below were similarly entitled to provide visual evidence of Luong's condition to prove she had suffered great bodily injury. We therefore find the trial court correctly allowed the People to decline the stipulation offer.

Regarding the admission of the videotape itself, we find no reversible error. As the People observe, there would have been no bar to presenting Luong as a live witness, yet that would likely have been even more harmful to the defense, as well as a difficult experience for Luong and her caretakers. We also agree with the trial court's rejection of any distinction between an injury and the result of that injury. If the People show the defendant's mayhem left the victim with only two fingers on one hand, does a photograph of the hand depict the injury or only its results?

There was thus a basis for introducing *some* videotape evidence of Mui Luong's condition. On the other hand, the videotape was approximately 37 minutes long, and much of it was arguably cumulative. Regardless of whether the admission of the entire videotape was proper, any possible error was harmless. We base this conclusion on not only the overall strength of the People's case, but also on defendant's offered alibi defense. Unlike a defense of mistake or accident, the videotape would not incline the jury to convict defendant unless it found he was the perpetrator. (Cf. *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406] [jury will not consider flight as inculpatory unless convinced of defendant's identity as perpetrator].) Furthermore, the videotape "would clearly have been admissible at the penalty phase [to show the harm defendant inflicted] even if not at the guilt phase [citation], thus obviating any possible prejudice at that phase." (*People v. Smith* (2003) 30 Cal.4th 581, 613 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

■ Although defendant asserts the standard of review is the "harmless beyond a reasonable doubt" standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], we have held

the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the "reasonable probability" standard of *Watson, supra*, 46 Cal.2d at page 836. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*); *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Although we apply *Watson*, we note that the result would be the same under *Chapman*.

b) *The Photographs*

Defendant also objects to the admission of several photographs introduced over his objection. These photographs included depictions of the bodies of the two murder victims, Peter Baeza and Daniel McDermott, as well as photographs of the crime scenes, the Gourmet Market, the Taco Bell, and McDermott's taxicab, and photographs depicting the surgery performed on Mui Luong. Some of the crime scene photographs portrayed blood splatters and other tangible signs of injury. The court determined the photographs were illustrative of the testimony, and therefore found them admissible.

We find the trial court properly exercised its discretion in admitting the photographs. " ' " 'The jury was entitled to see how the physical details of the scene and the bod[ies] supported the prosecution theory . . . .' " ' " (*Scheid, supra*, 16 Cal.4th at p. 16, quoting *People v. Pride, supra*, 3 Cal.4th at p. 243.) As the United States Supreme Court has explained, the "persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them." (*Old Chief v. United States* (1997) 519 U.S. 172, 187 [136 L.Ed.2d 574, 117 S.Ct. 644].) The admitted photographs assisted the jury in understanding the specifics of the crimes, and the People were entitled to employ such evidence to prove their case.

3. *Impeachment*

Defendant contends the trial court denied him due process of law in violation of the Fourteenth Amendment in allowing the People to impeach him with two prior convictions and his parole status at the time of his arrest. We find the trial court properly exercised its discretion.

a) *The Prior Convictions*

Before defendant testified, the People referred to four prior convictions with which they wished to impeach him: a 1989 conviction for grand theft person (Pen. Code, § 487), a 1985 conviction for sale of marijuana (Health & Saf. Code, § 11360), a 1983 conviction for battery on a peace officer

(Pen. Code, § 243, subd. (c)), and a 1980 conviction for battery with serious bodily injury (Pen. Code, § 243, subd. (d)). The defense did not challenge the use of the theft and marijuana sale convictions for impeachment. Although he agreed the two batteries involved moral turpitude, defendant argued they were too remote to be valid bases for impeachment. However, the trial court concluded the battery-with-injury conviction did *not* involve moral turpitude. The court permitted impeachment through all the other convictions.

Defendant invites us to reconsider Court of Appeal decisions holding that the sale of marijuana and the battery on a peace officer were offenses involving moral turpitude. (See, e.g., *People v. Lindsay* (1989) 209 Cal.App.3d 849 [257 Cal.Rptr. 529]; *People v. Standard* (1986) 181 Cal.App.3d 431 [226 Cal.Rptr. 62].) Moreover, " '[b]ecause defendant's crimes occurred prior to the adoption of Proposition 8 in June 1982 . . . the governing law [for determining the admissibility of a prior conviction for impeachment] was *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], not *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].' " (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1056 [90 Cal.Rptr.2d 607, 988 P.2d 531].) According to defendant's interpretation, *Beagle* applies so long as the prior crimes (used for impeachment) occurred prior to June 8, 1982, regardless of when the charged offenses occurred. (But see *People v. Gurule* (2002) 28 Cal.4th 557, 607 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

We decline to review these claims because defendant forfeited these arguments by failing to raise them at trial.[6] ■ We have held an " 'objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' " (*People v. Holt* (1997) 15 Cal.4th 619, 666–667 [63 Cal.Rptr.2d 782, 937 P.2d 213], quoting *People v. Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395].) A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal. For example, in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984] (disapproved on another ground in *Price, supra*, 25 Cal.4th 1046, 1069, fn. 13 ), the People objected to the admission of a hearsay statement, and the defense responded that the evidence was not hearsay because it was in the form of a question. We held the defense could not appeal the exclusion of the evidence on the ground that the statement was not hearsay because it explained the defendant's state of mind, as the defense had not presented that ground to the court and the People at trial. (*Hill*, at pp. 988–989.) Similarly, in *People v. Visciotti*

---

[6] Furthermore, only defendant's battery on a peace officer preceded June 8, 1982 (although his conviction occurred in 1983), and thus defendant's proposed rule would not apply to the theft and sale of marijuana convictions.

(1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388], the defense objected to only two specific inquiries during cross-examination, and based those objections on relevancy and assuming facts not in evidence. We therefore ruled the defendant had failed to preserve his appellate claims that the prosecutor's questions amounted to improper testimony and that the cross-examination exceeded the scope of direct examination. (*Id.* at pp. 51–52.) Accordingly, we find defendant has failed to preserve his challenges to the admissibility of the marijuana or battery convictions based on the alleged lack of moral turpitude involved or the standards for determining the admissibility of prior convictions for impeachment purposes. Furthermore, considering the strength of the case against defendant, as well as the magnitude of these offenses and the relatively minor nature of the prior convictions, we perceive no reasonable probability of a different result if the People had not impeached defendant.

### b) *Defendant's Parole Status*

In his opening statement defendant explained his possession of the gun by asserting that he was transporting the weapon in exchange for payment. The prosecutor thus wished to cast doubt upon that explanation by informing the jury that defendant's status as a parolee meant that his mere possession of the weapon could prompt his return to prison. As the trial court observed, the relevance of the parole status was not its tendency to undermine the credibility of *the witness* but the credibility of *the testimony.*

An analogous use of evidence might occur if a defendant were charged with theft and his defense at trial was that he had purchased the liquor found in his possession. The People might wish to introduce the defendant's driver's license that revealed he was 16 years old, not because there is anything intrinsically culpable about being 16 years old but because it would tend to undermine his claim that he purchased the liquor. ■ Similarly, the evidence of defendant's parole status was relevant as to the likelihood that defendant would transport someone else's gun and thereby risk returning to prison. Defendant's own testimony confirmed the probative nature of his parole status. "When [the police] came up to me, all I thought was ex-felon with a gun, five years." Furthermore, there was minimal prejudice attached to the evidence, in light of the nature of the charged crimes and the prior felony convictions properly admitted. We therefore conclude the trial court properly allowed the prosecution to elicit defendant's parole status.

Finally, in light of the overwhelming strength of the People's case, any possible error regarding the admission of either the prior convictions or defendant's parole status was surely harmless.

4. *Sufficiency of Evidence Supporting the Conviction for the First Degree Murder of Daniel McDermott*

Defendant contends insufficient evidence supports his conviction for the first degree murder of Daniel McDermott. We conclude sufficient evidence supports the conviction, on either a premeditation or a felony-murder basis. (§ 189.)

In determining the sufficiency of the evidence proving premeditation and deliberation, we review the entire record in the light most favorable to the People to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Silva* (2001) 25 Cal.4th 345, 368 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*).) Evidence concerning planning, motive, and manner of killing are pertinent to this determination, but these factors are not exclusive nor are they invariably determinative. (*Ibid.*)

The shooting of Daniel McDermott manifested all three factors. Defendant ordered Robin Menefee out of the taxi, which supports the inference that he did so to remove her from the scene before he killed. Moreover, if he brought a gun rather than money with which to pay for the taxi ride, it supports the inference that he planned a violent encounter with McDermott. (*People v. Adcox* (1988) 47 Cal.3d 207, 240 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [241 Cal.Rptr. 594, 744 P.2d 1127] (*Miranda*).) Defendant was found with seven $1 bills, whereas McDermott was found with no bills (nor was any money found in the car), which tends to show a robbery motive. Finally, the manner of the killing, a close-range shooting without any provocation (defendant discussed the baseball game with McDermott before shooting him) or evidence of struggle, likewise demonstrates premeditation and deliberation. (*People v. Hawkins* (1995) 10 Cal.4th 920, 956 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 [233 Cal.Rptr. 368, 729 P.2d 802].) Substantial evidence supports the jury's finding that the murder of Daniel McDermott was premeditated.

There was also circumstantial evidence supporting the finding that defendant murdered McDermott in the commission of a robbery or attempted robbery. Defendant was found with seven $1 bills and change. The People presented evidence that it was McDermott's habit to bring several $1 bills to work, with which he could make change. Defendant was found with seven $1 bills; no paper money was found on McDermott's person or in his car. Moreover, although defendant and Menefee had no money when they entered the taxi, they were able to buy groceries later that evening. The People also

showed that prior to picking up defendant on 13th Street and Broadway, McDermott was dispatched to Berkeley, and he did not inform the dispatcher that the passenger had failed to show up, which he would have done had the fare been a no-show.

Defendant asserts the evidence that he took property from McDermott is speculative, as "[n]o witness saw any money being taken from Mr. McDermott." However, circumstantial evidence may support a first degree robbery-murder finding, or a robbery-murder special circumstance. (*People v. Lewis* (2001) 26 Cal.4th 334, 367 [110 Cal.Rptr.2d 272, 28 P.3d 34] .) In *Lewis*, we affirmed a robbery-based special-circumstance finding. "Defendant admitted he had seen Simms keep money in her bra. Physical evidence also showed that the top of Simms's blouse was ripped open, revealing her brassiere containing a folded $20 bill, and that buttons that had come from Simms's blouse lay near her body. There was evidence that Simms had recently cashed a paycheck and that she normally set aside money for rent from the paycheck and used the rest to purchase crack. Based on these facts, a reasonable trier of fact could conclude that defendant robbed Simms." (*Ibid.*)

We also approved the admission of habit evidence in *People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146], where the defendant was found in possession of an envelope containing over $200 in cash, and evidence established it was the victim's habit to store money in envelopes to earmark it for special purchases. (*Id.* at pp. 1178–1180.) As in the instant case, no witness observed the defendant take money from the victim. But we nonetheless held "the jury could infer that defendant had the opportunity to steal (he leaned into the victim's car), did steal (he was found in possession of an envelope with money), and killed his victim to accomplish his crime." (*Id.* at p. 1183.) The same analysis obtains here.

Finally, even if defendant had been found without any money on his person, the jury could rationally have concluded he shot Mr. McDermott in an attempt to obtain money. (See *Silva, supra,* 25 Cal.4th at pp. 368–370.) We therefore reject defendant's evidentiary challenge to his conviction for the first degree murder of Daniel McDermott.

### 5. *Sufficiency of Evidence on the Other Counts and the Multiple-murder Special Circumstance*

Defendant challenges the validity of his other convictions. He contends there was insufficient evidence of premeditation and deliberation regarding the other three counts. Defendant also asserts the jury improperly relied on a felony-murder theory in convicting him of the first degree murder of Peter

Baeza. Additionally, he contends the absence of a proper first degree murder conviction invalidates the multiple-murder special-circumstance finding. We reject all these claims.

### a) *Premeditation and Deliberation*

The shootings of Mui Luong, Peter Baeza, and John Myers involved a similar factual predicate: defendant brought a gun to a place of business, shot workers at close range without any provocation, and maintained a calm, cool manner. Our decision in *Miranda*, *supra*, 44 Cal.3d 57, is thus dispositive. In *Miranda*, we observed that the defendant's bringing a loaded gun into a store and using it shortly thereafter to kill an unarmed victim reasonably suggested the defendant considered the possibility of murder in advance. The evidence of planning is even greater with regard to the shootings of Baeza and Myers, as defendant walked approximately 800 feet to the Gourmet Market after the Taco Bell shootings, suggesting the subject of murder was on his mind before he shot his next victims. Our *Miranda* decision also concluded the unprovoked shooting of victims standing unarmed behind a counter a few feet away supported the inference that the killing was the product of a deliberate plan rather than a rash explosion of violence. (*Id.* at p. 87.) The "calm," "cool," and "focused" manner of a shooting also supports the finding of premeditation and deliberation. (*People v. Vorise* (1999) 72 Cal.App.4th 312, 319 [85 Cal.Rptr.2d 12].) Furthermore, defendant shot Baeza after Baeza had reached for a telephone to call 911. Defendant thus had a motive to avoid apprehension and identification in shooting him.

We therefore conclude the evidence of premeditation and deliberation was sufficient for the counts involving Peter Baeza, John Myers, and Mui Luong.

### b) *The Baeza Verdict*

The trial court instructed the jury that "[t]he unlawful killing of a human being . . . which occurs during the commission or attempted commission of the crime of robbery is murder in the first degree when the perpetrator had the specific intent to commit such crime." Although this instruction did not specify either victim, the instruction on the robbery-murder special circumstance[7] limited its applicability to McDermott's murder. Defendant now contends the jury might have erroneously based its finding of first degree murder for the killing of Baeza on an invalid felony-murder theory. The instruction was correct, as it applied to the McDermott robbery murder, and if

---

[7] "The murder was committed while the defendant was engaged in the commission or attempted commission of the robbery of Daniel McDermott."

defendant perceived that the instruction might confuse jurors, it was defendant's obligation to seek clarification. (*People v. Arias* (1996) 13 Cal.4th 92, 170–171 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*); *Rodrigues, supra,* 8 Cal.4th at p. 1192.)

Furthermore, even if we assume that the jury considered the felony-murder theory and insufficient evidence supported it, defendant's first degree murder conviction remains valid. ██ Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground. (*Silva, supra,* 25 Cal.4th at pp. 370–371; *People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Thus, in a recent case where we observed there was sufficient evidence that the defendant premeditated and deliberated the murder, we held that if there was insufficient evidence of felony murder, we could assume the jury relied on the factually sufficient ground of premeditation. (*Silva,* at pp. 370–371.) Because there was sufficient evidence showing Baeza's murder was premeditated and deliberate, there is no basis for reversal. (*Ibid.*)

### c) *The Multiple-murder Special Circumstance*

The jury thus validly convicted defendant of first degree murder regarding the murders of both Daniel McDermott and Peter Baeza. Accordingly, the multiple-murder special-circumstance finding was valid.

## C. *Penalty Phase*

### 1. *The Transportation-worker Special Circumstance*

Defendant contends the penalty phase verdict is invalid because one of the special circumstances found by the jury, the murder of a transportation worker, does not support a sentence of death, only life imprisonment without parole. (§ 190.25.) He contends this error violated the heightened reliability requirement imposed in capital prosecutions by the Eighth and Fourteenth Amendments to the United States Constitution.

██ To render a defendant eligible for the death penalty, the jury must find true at least one of the special circumstances listed in section 190.2. Once it does so, the jury must then decide in a penalty phase whether the defendant should be sentenced to death or to life imprisonment without possibility of parole. The jury weighs the factors listed in section 190.3 in making this determination.

The jury below found three special circumstances: (1) defendant committed multiple murders (§ 190.2, subd. (a)(3)); (2) the murder was committed during a robbery (§ 190.2, subd. (a)(17)(A)); and (3) the victim was a transportation worker (§ 190.25). Although the transportation-worker special circumstance is not a special circumstance that supports a death sentence, thereby leading to a penalty phase, the two section 190.2 special circumstances properly rendered the defendant death-eligible, subject to the penalty phase, where the jury would apply the section 190.3 factors. (*People v. Hamilton* (1988) 45 Cal.3d 351, 364, fn. 7 [247 Cal.Rptr. 31, 753 P.2d 1109].)

Defendant claims, however, "It does not make any difference whether the other special circumstances were proved because we have no way of telling for sure whether it was special circumstance [No.] 1, or 2, or 3, or some combination . . . which caused the jury to return the death verdict." But once the jury has found a section 190.2 special circumstance, the determination of whether to sentence the defendant to death or life imprisonment without the possibility of parole depends on the section 190.3 factors. Among these factors is factor (a): "The circumstances of the crime of which the defendant was convicted in the instant proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." Accordingly, there was nothing improper about the prosecutor's emphasizing that defendant murdered McDermott while he was doing his job as a taxicab driver, as this was a circumstance of the charged crime.

Section 190.25, subdivision (c), specifically provides, "Nothing in this section shall be construed to prohibit the charging of any [other] special circumstance." "While the statute does not authorize the death penalty, it does not prohibit that penalty if *other* special circumstances are proved." (3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 459, p. 612.) If we were to accept defendant's argument, it would turn the circumstance of killing a taxi driver on duty, a fact the Legislature has deemed worthy of special sanction (albeit less than some other special circumstances), into a shield from liability. If the Legislature had never enacted section 190.25, the prosecutor still would have been free to argue that the circumstances of the killing, which included the killing of a taxi driver doing his job, supported a death verdict. (§ 190.3, factor (a).) There would be no basis for reversal, as both the multiple-murder and robbery-murder special-circumstance findings were valid. By contrast, according to defendant, because the Legislature decided the killing of a taxi driver supported a sentence of life imprisonment without parole, we must now reverse. We decline to infer such an exculpatory effect from the Legislature's decision to *increase* the penalty for murdering transportation workers in cases where there are no other special circumstances.

### 2. *Defendant's Prior Conviction of Battery on a Peace Officer*

Defendant asserts a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and the California Constitution, because the trial court instructed the jury that evidence had been introduced to show defendant had four prior convictions (which the jury had previously determined), including battery on a police officer. (§ 243, subd. (c).) The jury was further instructed that before it could consider any alleged crime as an aggravating circumstance, it must be satisfied beyond a reasonable doubt that defendant was in fact convicted of the prior crime. Defendant now claims this instruction was error, because there was insufficient evidence the police officer suffered injury within the meaning of section 243, subdivision (c). ██ A defendant may collaterally attack a prior conviction, but must overcome a strong presumption of constitutional validity. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1013 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Defendant has never established the invalidity of his prior conviction, and therefore the instruction was proper.

### 3. *The Victim Impact Testimony of Thomas Carter*

Defendant contends the trial court violated his Eighth and Fourteenth Amendment rights by allowing Thomas Carter to testify about the impact of Peter Baeza's death. We conclude the trial court properly admitted the testimony.

Carter testified that because he suffered from a seizure disorder, nobody would give him a job—except Baeza, who treated him like a son. Baeza helped Carter in getting financial assistance for his disability. Baeza treated Carter like a human being, whereas others did not. Prior to Baeza's death, Carter's seizures had improved and were almost gone. Since Baeza's death, Carter lost his job and was unable to find any other work. His physical condition deteriorated, and his fiancée left him. Baeza extended credit to many elderly people.

Defendant contends the evidence should have been excluded because Carter was not a relative of Baeza's. The United States Supreme Court has not restricted the admissibility of victim impact evidence to relatives, however. ██ The court has recognized the People are entitled to show "the victim is an individual whose death represents a unique loss to society and in particular to his family." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Furthermore, the separate opinions in *Payne* recognized the broad scope of victim impact evidence. The jury may

know "the full extent of the harm caused by the crime, including its impact on the victim's family *and community.*" (*Payne v. Tennessee, supra,* 501 U.S. 808, 830 (conc. opn. of O'Connor, J.), italics added.) Murderers know their victims "probably ha[ve] close associates, 'survivors,' who will suffer harms and deprivations from the victim's death . . . . [T]hey know that their victims are not human islands, but individuals with parents or children, spouses *or friends* or dependents." (*Payne v. Tennessee, supra,* 501 U.S. 808, 838 (conc. opn. of Souter, J.), italics added.) We therefore have drawn from *Payne* that it is proper to refer "to the status of the victim and the effect of his loss on friends, loved ones, and the community as a whole." (*People v. Fierro* (1991) 1 Cal.4th 173, 236 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Defendant's argument thus must rest on a purported distinction between the admissibility of evidence describing the murder's impact *on nonrelatives,* which we have permitted, and testimony *by nonrelatives,* to which defendant now objects. This distinction is unsound, however, and would prove unworkable in cases where the only available witnesses were not formally related to the victim. We therefore hold the trial court properly admitted the testimony of Thomas Carter.

### 4. *The Trial Court's Rereading of CALJIC No. 8.88*

During the penalty phase deliberations, the jury passed a note to the court stating, "We, the jury in the above entitled cause request the following: 'If a juror(s) comes to the conclusion that the aggravating circumstances far outweigh the mitigating circumstances must the juror(s) then automatically choose the death penalty?' ". The court answered by reading an excerpt from CALJIC No. 8.88.[8] Defendant asserts this reading violated his rights under

---

[8] CALJIC No. 8.88 reads: "After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors, aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences which is above and beyond an element of the crime itself. [¶] A mitigating circumstance is any fact, condition, or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weight to any of them. You are free to assign[] whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and sections 7, 15, and 17 of article I of the California Constitution. Defendant contends the trial court "failed to correctly answer" the jury and should have instead given a shorter answer: "No." The instruction is a correct statement of law, however, and if defendant favored further clarification, he needed to request it. His failure to do so waives this claim. (*Arias, supra,* 13 Cal.4th at pp. 170–171; *Rodrigues, supra,* 8 Cal.4th at p. 1192.)

### 5. *Constitutional Challenges*

Defendant finally raises numerous challenges to the constitutionality of California's capital procedures. We have rejected these claims and do so again. ■ Accordingly, we reiterate the following holdings: California's death penalty law sufficiently narrows the class of death-eligible defendants. (*People v. Lewis* (2001) 25 Cal.4th 610, 676 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347].) ■ The law does not impose overly broad death-eligibility for felony murder. (*Lewis,* at p. 676; *Anderson,* at p. 601.) ■ The discretion exercised by California prosecutors is proper. (*Lewis,* at p. 676; *Anderson,* at p. 601; *People v. Ochoa* (2001) 26 Cal.4th 398, 462 [110 Cal.Rptr.2d 324, 28 P.3d 78].) ■ A trial court need not instruct the jury that they must find beyond a reasonable doubt the following: (1) the existence of aggravating circumstances except other-crimes evidence; (2) that aggravation outweighs mitigation; and (3) that death is the appropriate penalty (*Anderson,* at p. 601). ■ The federal Constitution does not require intercase proportionality review (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]), and we perform intracase proportionality review "to determine whether the penalty is disproportionate to defendant's personal culpability." (*People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225].) ■ Section 190.3, factor (a) is not impermissibly vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *Anderson,* at p. 601.) It also does not require written findings of aggravating factors (*Tuilaepa,* at pp. 975–980; *Anderson,* at p. 601), bar the consideration of unadjudicated criminal activity (*Tuilaepa,* at pp. 976–977; *Anderson,* at p. 601; *People v. Cain* (1995) 10 Cal.4th 1, 69 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), or require instruction as to which factors are aggravating and which are mitigating (*Anderson,* at p. 601; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130]). ■ The passing of time between conviction and execution does not violate the federal Constitution (*Ochoa,* at pp. 462–464), and lethal injection is a constitutional means of execution (*Ochoa,* at p. 464).

## III. CONCLUSION

For the reasons stated herein, the judgment is affirmed.

George, C. J., Kennard, J. Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**CHIN, J.**, Concurring—I concur fully in the majority opinion, including its conclusion that defendant's arguments regarding impeachment with some of his prior convictions are not cognizable. (Maj. opn., *ante*, at pp. 227–229.) I write separately only to note that the arguments also lack merit.

The California electorate passed Proposition 8 in June 1982. A short time later, we held that it "applies only to prosecutions for crimes committed on or after its effective date." (*People v. Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) Accordingly, when the *charged* crime predated Proposition 8, trial courts had to apply the law that existed before its adoption, including the law relating to impeachment with a prior conviction. (See, e.g., *People v. Carpenter* (1999) 21 Cal.4th 1016, 1056 [90 Cal.Rptr.2d 607, 988 P.2d 531].) Defendant, however, committed the charged crimes in 1990. Thus, this prosecution is for crimes committed long *after* Proposition 8's effective date. The date of the charged crime matters, not the date of the prior conviction or its underlying crime. (*People v. Gurule* (2002) 28 Cal.4th 557, 607 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Accordingly, and contrary to defendant's assertion, Proposition 8 applies to this trial. (E.g., *People v. Sandoval* (1992) 4 Cal.4th 155, 177–178, 186 [14 Cal.Rptr.2d 342, 841 P.2d 862] [applying post-Proposition-8 law to impeachment with a 1979 conviction where the charged crimes occurred in 1984]; see also *People v. Jackson* (1985) 37 Cal.3d 826, 833 [210 Cal.Rptr. 623, 694 P.2d 736] [Proposition 8's five-year enhancement for serious felony convictions applies when the prior conviction predates, but the charged crime postdates, Proposition 8].)

It has also long been settled that defendant' s prior convictions involve moral turpitude. (*People v. Lindsay* (1989) 209 Cal.App.3d 849, 854–858 [257 Cal.Rptr. 529] [battery on a peace officer]; *People v. Clarida* (1987) 197 Cal.App.3d 547, 552 [249 Cal.Rptr. 363] [same]; *People v. Standard* (1986) 181 Cal.App.3d 431, 435 [226 Cal.Rptr. 62] [possession of marijuana for sale, noting that possession for sale, unlike simple possession, involves the intent to corrupt others].)

The court's choice not to discuss the merits of these forfeited arguments should not be read as casting doubt on any of this settled law.

Appellant's petition for a rehearing was denied October 1, 2003.