I respectfully dissent from that portion of the majority's opinion finding that the trial court did not abuse its discretion in requiring a uniformed, armed deputy sheriff to sit immediately beside appellant during his testimony.
 The jury's decision necessarily turned on whether it believed the version of events testified to by the victim, or by the appellant — a classic "she said/he said" trial. Under the circumstances of this case, requiring appellant to testify while a uniformed, armed bailiff sat by his side on the witness stand was an abuse of discretion and resulted in a prejudicial deprivation of appellant's rights to due process guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, and by article I, section 24 of the California Constitution.
 Appellant posed no security risk warranting the unusual move, and the fact that he was in custody because he was unable to post $45,000 bail was an *Page 550 
inadequate reason for this infringement of appellant's constitutional right to a fair trial. The principal justification for the court taking such an extraordinary security measure was to comply with the Alameda County Sheriff's Office preferred policy of sitting with in-custody defendants while they testify. Reflexively following this policy was an abdication of the trial judge's responsibility to make reasoned judgments about the need for unusual courtroom security, and to balance that stated need against a criminal defendant's right to a fair trial. (People v.Jackson (1993) 14 Cal.App.4th 1818, 1824-1825 [18 Cal.Rptr.2d 586] (Jackson).)
 Compounding the prejudice was the additional error, waived by a failure of defense counsel to object, in allowing a "support person" (an employee of the Alameda County District Attorney's Office who was misidentified to the jury as a "victim witness advocate") to sit next to the 16-year-old victim during her testimony, without the judge making the sua sponte finding of need required by Penal Code section 868.5, and theFifth Amendment of the United States Constitution.
 In a case that was decided largely upon which witness appeared more credible to the jury, this confluence of events presented intolerably dissimilar portraits of these two witnesses. As each gave their testimony, the victim was accorded an enhanced aura of believability, while appellant was branded "`with an unmistakable mark of guilt.'" (Holbwok v. Flynn (1985) 475 U.S. 560, 571 [89 L.Ed.2d 525, 106 S.Ct. 1340] (Holbwok).) Such a display of additional security directed at appellant necessarily conveyed a maleficent impression to the jury that appellant was "`dangerous or untrustworthy,'" eroding the presumption of innocence to which appellant was entitled. (Id. at p. 569.) Under the facts of this case, the challenged action is so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial. (Id. at pp. 571-572.) Therefore, the judgment should be reversed, and the case returned to the trial court for further proceedings.
 I. The victim, appellant's daughter, who was 14 years old[1] at the time of the alleged sexual assault, testified that she entered her father's truck on July 13, 2004, when he began smoking "crystal" from a pipe. He instructed her to remove her pants. When she refused, he placed a "rock" in the victim's mouth and told her to suck it. The victim testified that appellant then began to suck on her neck, pulled down his pants and instructed her to perform oral sex on him while he pushed her head towards his penis. She escaped from the truck and took the bus home to her grandmother's house, where she later reported the incident. *Page 551 
 Appellant testified and denied the victim's version of events. He specifically denied smoking crack with the victim, giving her crack, pulling down his pants, sucking on her neck, or performing any lewd acts.
 When the victim returned home on the evening of July 13, she had a hickey on her neck which the victim's grandmother had not seen earlier that day. Appellant testified, however, that she already had it when he first saw her that day, and the victim admitted that her boyfriend gave it to her. Furthermore, the victim's paternal grandmother had seen her with a hickey on her neck on a prior occasion.
 The victim had a rock of cocaine in her possession, and her urine tested positive for cocaine. Appellant also was under the influence of cocaine when police found him. While consistent with the claim that appellant was the source of the drugs the victim had, it does not exclude other sources, nor does it substantiate the charge of sexual assault.
 After police were notified and contacted appellant, he ran. However, appellant was already running from an attack by the victim's mother and another man who appeared on the scene shortly before police arrived. The victim's mother was carrying a stick with which to beat appellant. When the police arrived appellant continued to run because he was scared.
 The defense also presented evidence of a prior occasion when the victim had made up a story that she had been stabbed in order to get her father to telephone her.
 Thus, it is quite apparent that, apart from the testimony of the victim, the evidence presented at trial, although consistent with guilt, was equivocal and inconclusive. On the one hand, if the victim were believed, then appellant would be doubtlessly found guilty of the charges. On the other hand, if appellant were believed, a not guilty verdict was inevitable.
 That this was a difficult and close case can be inferred from other circumstances as well. It took two and a half days to select the jury. Deliberations lasted nine and a half hours over two days. During deliberations, the jury asked for video playback equipment with which to play the videotape of the victim's interview by police. They also asked the court reporter to read back the testimony of the victim. Therefore, the state of the evidence rendered it critical for the trial judge not to allow the demeanor, and thus the credibility, of either of the two key witnesses to be enhanced or diminished unfairly. *Page 552 
 II. A. Appellant was in custody at the time of trial, being unable to post the $45,000 bail earlier set by the court.[2] His only prior felony conviction was for car theft (Veh. Code, § 10851) in 2001, for which he was granted probation. There is nothing in the record indicating that appellant was a security or escape risk, or that he had a penchant for violent acting out while he was in custody, or while in the courtroom.[3]
 After the prosecution rested, counsel and the trial court met to discuss several issues, including what, and how, courtroom security would be deployed if appellant testified. The following exchange occurred:
 "MR. YUN [defense counsel]: Yes, Your Honor. At this point, we are coming to the close of our case. I talked to my client about possibly testifying, and I've been informed by both the Court and by the deputies in the courtroom that if my client does decide to take the witness stand, that it is the policy — I'm not sure whose policy, but it is policy to have a deputy sit with him at the witness stand while my client testifies. I am going to object to that procedure if that is going to be employed.
 "I believe having a deputy up on the stand with my client unduly prejudices my client. He has a right to testify at a trial, and I think by putting a deputy there is, basically, a human shackle, and I believe the case law is clear that unless there is good cause for why he either — the Defendant needs to be shackled or another deputy next to him, that it is against — it violates his right to fair trial and right to due process under the Federal and State Constitution[s].
 "Throughout the trial, I don't think there's been any evidence that Mr. Stevens has done anything that would suggest he would in any way threaten or hurt any of the jurors, any of the court staff, or that he would in any way attempt to escape or relinquish himself from his custody status. I think he should be able to go up to the stand and testify in open court. That's what a public trial is for, for everybody to get a day in court without having a deputy there, which would suggest and communicate to the jury somehow my *Page 553 
client was dangerous and I think that is how that could affect the jury's assessment of his credibility.
 "THE COURT: Mr. Yun, as you probably notice, there's been a deputy here throughout the entire trial sitting right behind him. Having the deputy in, basically, the same proximity, I think, will be no more prejudicial than it has been to that point, and the Alameda County Sheriff's Department policy of having a deputy at the stand with an in-custody for safety purposes, or even to prevent escape, is certainly reasonable, and jurors are much more concerned about their own safety these days anyway.
 "As I indicated to you in chambers, I had a juror who had indicated that that juror felt uncomfortable with a police officer in full uniform with a weapon sitting at the witness stand. And I don't want the jury in any way to be distracted by any of those concerns, because the jury knows that the Defendant's in custody, and I don't want them to have that kind of a distraction when he's testifying. If he decides to testify, it's certainly in his best interest not to have the jury distracted by concerns they have of their own safety. He wants them to listen to him.
 "So that will be the structure we're going to use when he takes the stand.
 "Mr. Beltramo [prosecutor], do you want to say anything on the record?
 "MR. BELTRAMO: I want to add that the Defendant has become agitated, outwardly agitated, in the presence of the other deputy; not these deputies, but in front of other deputies. I know it was submitted one of the jurors noting his agitation and his motions and irritability, and I think given that concern that the jury expressed, the Court's reasoning is all the more founded.
 "THE COURT: Okay. Thank you, Counsel. Let me know as soon as the witness comes. I want him on the stand so I can talk to him. [¶] [Recess taken.]"
 B. Especially in today's troubled times, I have no quarrel with judicial decisions noting that the sight of multiple, armed guards in courtrooms in order to maintain law and order generally is common, and for that reason, their presence does not necessarily reflect adversely upon the character of the accused. However, ordering one of these officers to leave his or her normal position in the courtroom, escort the defendant to the witness stand, pull up a chair and sit right beside the accused in the direct sightline of the jurors, and *Page 554 
then to sit there throughout the defendant's testimony, sends an unmistakable message to the jury that the defendant is dangerous, likely to have committed the crimes charged, or at least is not as worthy of belief as are other witnesses. Before doing so, due process demands that the trial court articulate a case-specific justification for taking this extraordinary step that outweighs its negative impact on the defendant.
 I agree with defense counsel's characterization that the action taken here was akin to restraining defendant with a "human shackle." More than 30 years ago, our state Supreme Court noted that shackling a defendant in the presence of a jury "is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged." (Peoplev. Duran (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322].) In addition, such restraints impair the right of the defendant to be brought before the court "`with the appearance, dignity, and self-respect of a free and innocent man.'" (Ibid., citing Eaddy v. People (1946)115 Colo. 488, 492 [174 P.2d 717].)
 The United States Supreme Court has voiced this same potential concern with regard to the deployment of security personnel inside the courtroom as well: "To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions `create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" (Holbrook, supra, 475 U.S. at p. 569.)
 In Holbrook, the defendant claimed that the presence of multiple security guards in the courtroom during his trial was "inherently prejudicial." The court disagreed that the general placement of guards in that case justified a presumption that the defendant's due process right was jeopardized: "While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." (Holbrook,supra, 475 U.S. at p. 569.)
 However, the high court differentiated the general use of security from that directed at the defendant in a manner which diminishes the presumption of innocence, or which implies that the accused is dangerous or not inherently credible: "If they are placed at some distance from theaccused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. . . . [T]hey are doubtless taken for granted so long as their numbers or weaponry do not suggest particular *Page 555 official concern or alarm." (Holbrook, supra, 475 U.S. at p. 569, italics added.) In finally rejecting the defendant's call for a presumption of prejudice whenever armed security is used in a criminal trial, the court instead suggested a "case-by-case approach" was "more appropriate." (Ibid.)
 The "distinction is critical" whether the focus of security turns away from the nature of the case, or any concerns about order inside or outside of the courtroom generally, and instead focuses on the character of the defendant. (People v. Ayala (2000) 23 Cal.4th 225, 252 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Where the focus of security is on the defendant, courts must consider the need for unusual security and balance that need against the level and degree of prejudice using that security may cause to the defendant's credibility.
 The majority seeks support for its contrary view by citing People v.Marks (2003) 31 Cal.4th 197 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (Marks).Marks actually supports appellant's argument, and illustrates just the sort of analysis that due process requires. One of the many issues raised by the defendant in Marks was the contention that the deployment of an extra security guard "next to and slightly behind Juror No. 7" violated his due process right, among other rights. (Id. at p. 223, fn. 5.) For this reason, the defendant argued that, like the decision to shackle a defendant, trial courts must demonstrate a "`manifest need'" to position security near the defendant while he testifies. (Id. at p. 222.)
 The Marks court concluded that, although physically restraining a defendant negatively affects the jury's perception of the defendant, as well as impairs the accused's mental faculties while testifying, "`it is entirely possible'" that the jury would not infer anything from the deployment of security forces in the courtroom, including near the defendant. (Marks, supra, 31 Cal.4th at p. 224.) Therefore, courts were not required to articulate "manifest need" justifying their decisions where to deploy marshals inside the courtroom. (Ibid.)
 In its place, it appears that the court applied the abuse of discretion standard in reviewing the lower court's decision and found, "[u]nder any standard of review, the trial court properly exercised its discretion in securing the courtroom." (Marks, supra,31 Cal.4th at p. 224.) Indeed, this conclusion is mandated by the aggravated facts in Marks, which left no room for the defendant to argue that the court abused its discretion.
 Earlier in the Marks trial, both defense counsel asked that their client be physically restrained during the trial; one out of concern that the defendant might injure counsel during trial, and the other out of concern that the defendant would injure his case by committing misconduct in front of the *Page 556 
jury. (Marks, supra, 31 Cal.4th at p. 222.) The Supreme Court also emphasized that the defendant "had attacked his own counsel in the courtroom, and his disruptive behavior and violations of court orders had led to his removal at one point." (Id. at p. 224.) In exercising its discretion, the trial court "observed the proximity of the witness stand to the jury box, [4] and reasonably concluded it would be irresponsible to leave the jury unprotected from a capital defendant with a record of violent behavior in the courtroom." (Marks, at p. 224.)
 Therefore, given the defendant's persistent violent misconduct throughout his trial, and the configuration of the particular courtroom that made it otherwise difficult for security to be maintained while Marks was on the witness stand, the Supreme Court concluded that the decision to post a bailiff next to the defendant (but apparently out of the direct sight of most, if not all, of the jurors) was not an abuse of discretion. Marks represents just the type of case-by-case approach deemed "appropriate" by the United States Supreme Court in Holbrook,supra, 475 U.S. at page 569, an approach also explicitly endorsed by our own Supreme Court as well. (People v. Jenkins (2000) 22 Cal.4th 900, 998
[95 Cal.Rptr.2d 377, 997 P.2d 1044].)
 Applying an abuse of discretion standard, there can be no doubt that the trial court's decision here was error. In stark contrast to the personalized and particularized justification in Marks, there was no justification here. Rather, the trial court mechanically deferred to sheriff's department "policy" of having a uniformed, armed deputy sheriff sit with all in-custody defendants while they testified, out of a generalized concern for safety or the possibility of escape. This very type of deference has been criticized as an abuse of discretion. (Jackson, supra, 14 Cal.App.4th at pp. 1824-1825.) As I have already noted, nothing in the record demonstrates appellant posed a security or escape risk. He had no documented violent history in or out of court. In the jury's estimation, even the crimes for which he was on trial did not involve "great violence" or "threat of great bodily harm," and did not indicate that appellant was a serious danger to society. Consequently, unlike Marks, there was no reason that security could not be maintained by deploying the deputy elsewhere in the courtroom, and not in the direct line of sight of the jury as they heard and watched appellant testify.
 While the judge's ruling was difficult to decode, another reason was suggested by the trial judge for the unusual security arrangement. He *Page 557 
expressed the belief that having an armed guard sit next to appellant would actually lessen the chance that the jurors would be distracted during his testimony. However, it is hard to see how the brief anecdote the court related supported this view. Apparently, a juror[5] "felt uncomfortable with a police officer in full uniform with a weapon sitting at the witness stand." That being the case, I am mystified as to how insisting that another uniformed police officer bearing a weapon sit on the witness stand next to appellant would assuage any such discomfort. There is also at least a hint that the trial judge may have thought that this extra security would enhance the jury's concentration by allaying any concern it could have for its own safety, but there is no indication that this jury had such a concern, or that appellant posed such a risk.[6]
 It was even more important in this case than in most criminal cases for the court to have made a thoughtful assessment, or balancing, of the need for such conspicuous security because (1) this was a "she said/he said" case, and (2) the trial court had already allowed the victim to testify with a "support person" by her side, an event that the court completely overlooked in assessing the need for security on the witness stand while appellant testified.[7]
 The use of "support persons" during the courtroom testimony of minors in criminal cases is governed by Penal Code section 868.5. Because such use infringes on a criminal defendant's right of confrontation, particularized findings of need are constitutionally required before support persons can be allowed to accompany a witness on the stand. (Adams, supra, 19 Cal.App.4th at pp. 443-444.) *Page 558 
 Additionally, the use of support persons carries with it potential consequences that may be inimical to the fair assessment of the witnesses' credibility. As noted by the Adams court: "The support person's demeanor, as unavailable to a reviewing court as a witness's demeanor, can influence the jury in its assessment of the witness's credibility. It can thus bolster the witness's credibility and operate as unsworn opinion evidence of the truth of the charges." (Adams, supra,19 Cal.App.4th at p. 439.)
 Another court described how support person usage may itself enhance the testimony of a victim witness, including "(1) the potential of influencing the jury with a subconscious message that the victim is traumatized and therefore it is more likely the sexual assault occurred, and (2) the concern that the presence of a person supporting the witness may add credibility to the witness's testimony — i.e., the support person is vouching for the credibility of the witness." (People v. Patten (1992)9 Cal.App.4th 1718, 1726 [12 Cal.Rptr.2d 284] (Patten).)
 Factors that bear on the degree of influence a support person may have on the credibility of the witness include how close to the witness the support person sits while testimony is given. "[T]he closer the support person is located to the victim-witness, the higher the risk the jury might be influenced." (Patten, supra, 9 Cal.App.4th at p. 1732.) Also, the younger the victim, the more likely the jury is to understand the need for a support person, and thus, less likely to be influenced by his or her presence. (Ibid.) In this case, the victim was 16 years old. Moreover, the fact that the support person in this case was unrelated to the victim, but instead was from the prosecutor's office, is an "important consideration" in assessing the potential impact of this device. (Id. at pp. 1731-1732.)
 The nature of the defense is also an important factor in evaluating the potential influence a support person's presence may have on the jury. Where the defense is consent, or in this case, a frank disavowal of the alleged misconduct, the credibility of the victim is crucial. (Patten, supra, 9 Cal.App.4th at pp. 1731-1732.)
 So indifferent to these concerns was the trial court that, rather than fashioning a careful statement for the jury explaining the role of the support person, it invited the prosecution to formulate his own explanation to the jury. *Page 559 
Given this unbridled latitude, the prosecutor obliged by putting a decidedly proprosecution spin on his elucidation:
 "THE COURT: Mr. Beltramo, for the record, do you want to identify the person next to [the victim]?
 "MR. BELTRAMO: Thank you. This is Kelli Sage of our Victim Witness Program here at the DA's Office. Under the provisions of the Penal Code, the victim of a sexual assault is allowed to have a victim witness advocate at their side. I'll be talking to [the victim] about that, perhaps even Kelli about that, about what her role is, primarily to provide support for the victim."
 It is no quibble to point out that Penal Code section 868.5
denominates such persons as "support persons," and the misdescription used by the prosecution, "victim witness advocate," could only have worked to compound sympathy for the victim and prejudice against appellant.
 The importance of reviewing case law relating to the use of support persons rests not on that decision itself, but instead on the failure of the trial court to consider the potential consequences of that decision when it subsequently ordered, in sharp contrast to a support person, a uniformed, armed police officer to take up the same position while appellant testified.
 Finally, I note that the trial court made no attempt to blunt the impact of the effect of the use of a security escort during appellant's testimony, or the use of a support person while the victim testified, for that matter. (Patten, supra, 9 Cal.App.4th at p. 1732.) The only admonition given by the court was contained in the standard jury instructions read long after the victim and appellant had testified. Moreover, as in virtually all in-custody criminal trials, the instructions simply told the jury they were to disregard appellant's custody status in deciding the case.
 Therefore, taken as a whole this case presents precisely the constellation of facts presaged by the United States Supreme Court inHolbrook as one where the use of courtroom security unreasonably "`create[d] the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" (Holbrook, supra, 475 U.S. at p. 569.) Where the challenged action is so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial, prejudice is presumed and no showing of actual prejudice is necessary. (Id. at pp. 571-572.) If actual prejudice need be shown (People v. Jenkins, supra,22 Cal.4th at p. 998), the particular circumstances of this case inescapably reveal that prejudice to appellant. *Page 560 
 For these reasons, appellant has been convicted without being accorded due process of law, and I would reverse and remand the case for a new trial.
[1] She turned 15 years old two days after the events described.
[2] Prior to his arrest, appellant was working for cash as a landscape laborer.
[3] Except for the single stolen vehicle conviction in 2001, other prior convictions were all misdemeanors. Even as to the convictions currently under review, the jury made special findings that (1) the crimes did not involve great violence, threats of violence, or a high degree of cruelty, viciousness, or callousness, and (2) appellant did not engage in violent conduct which would indicate that he was a serious danger to society.
[4] The trial court observed that the jury box was only about four feet from the witness stand, and in light of the defendant's prior conduct, it would be a "`total dereliction of [the court's] responsibility' to have the nearest marshal `some 30 or 40 feet away, who would have to go around tables, chairs and other people [to] get to [defendant].'" (Marks, supra,31 Cal.4th at p. 223.)
[5] It is not at all clear from the record or from the briefs whether the juror mentioned was on this jury or on another case in the judge's courtroom.
[6] The prosecutor made some reference to "agitation" by appellant reported by an unidentified security guard, not a courtroom bailiff, and perhaps a juror noted "his agitation and his motions and irritability," but the trial court took no steps to clarify counsel's comment, and did not base its decision on this vague, offhanded comment. It was clarified later in the proceedings that the juror referred to by the prosecutor was not
afraid of, or felt threatened by, appellant.
[7] I also disagree with the majority's conclusion that it was not error for the trial judge to allow a support person to sit at the side of the victim while she testified, or that it was supported by an "implied finding" of need based on the victim's age alone. (Maj. opn., ante, at p. 546.) (See Coy v. Iowa (1988) 487 U.S. 1012, 1021 [101 L.Ed.2d 857,108 S.Ct. 2798]; People v. Adams (1993) 19 Cal.App.4th 412, 443-444
[23 Cal.Rptr.2d 512] (Adams).) It was the responsibility of the trial judge to make this determination, although the majority points out that the jury found "true" that the victim was vulnerable within the meaning of California Rules of Court, rule 4.421(a)(3), for sentencing purposes. For what it is worth, the jury made inconsistent findings on this question when it also found "not true" that the victim was particularly vulnerable "due to age or significant disability," within the meaning of Penal Code section 1170.85, subdivision (b). In any case, the error was waived when appellant's trial counsel failed to object before the victim began testifying. (People v. Lord (1994) 30 Cal.App.4th 1718 [36 Cal.Rptr.2d 453].) *Page 561