Filed 6/12/14  P. v. Ditto CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID PATRICK DITTO,<br><br>Defendant and Appellant. | D062645<br><br><br><br>(Super. Ct. No. SCD233038) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed.

Allen R. Bloom for the Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, William M. Wood, Megan J. Beale, Deputy Attorneys General for the Plaintiff and Respondent.

A jury convicted David Patrick Ditto of the first degree murder of his wife, Karina Ditto (Karina).[1]  (Pen. Code,[2] § 187, subdivision (a).)  The court sentenced him to 25 years to life in state prison.

Ditto contends:  (1) it was error for the jury not to receive evidence purportedly showing that Karina's heart was beating, and she was not cold, when paramedics arrived at the crime scene; and (2) the trial court erroneously allowed paramedics and nurses to opine regarding Karina's time and cause of death, and that Ditto was a liar and guilty of a crime.  We affirm the judgment.

## FACTUAL BACKGROUND

*Prosecution Case*

Raymond McQueen, a firefighter and paramedic, testified that on March 12, 2011, he and a team of paramedics and firefighters responded to a call at 12:35 a.m., and arrived at the Ditto residence at 12:40 a.m.[3]  McQueen saw one of Ditto's arms covered in blood.  Karina was covered in blood and lying on the floor.  McQueen testified Karina felt cold to the touch:  "With falls or even patients who we normally get in CPR status, there's blood flowing throughout your body, which keeps you at a normal temperature . . .

---

[1]    We refer to the victim by her first name to avoid confusion; we mean no disrespect.

[2]    All statutory references are to the Penal Code unless otherwise stated.

[3]    On cross-examination, defense counsel questioned McQueen about more precise times mentioned in a computer aided dispatch system report (CAD) that listed the firefighters' dispatch time as 29 seconds later and the arrival time at the Ditto residence as being 55 seconds later than McQueen had testified about on direct examination. McQueen agreed that the times stated in the CAD report were more precise.

2

depending on each patient.  You can feel that temperature with the back of your hand even through the vinyl gloves that we wear.  [¶]  Upon my initial assessment, right when we walked in, the skin signs is one of the main things—one of the first things that we check for, one of the first vital signs that we can assess.  And I noticed that [Karina] was a little bit colder than what I would have expected."  The prosecutor asked McQueen, "[W]as it unusual, in your experience, to have someone that you were called for an injury and to have them be hypothermic at their core within a half an hour?"  McQueen answered in the affirmative, and agreed with the prosecutor that a person's body temperature generally takes "some time" to drop.

A recording device attached to a cardiac monitor captured the conversation among the first responders as they treated Karina.  The jury heard the recording, in which Ditto was asked, "How long has she been down?"  Ditto replied, "Two minutes."  Asked if he had heard Karina fall, Ditto replied, "She was here.  And I came to her.  And she wasn't moving.  And I was talking to her, talking to her, and then, and then she, she came to, and she started moving around so, I (unintelligible) and then she started, she started, she stopped.  And I was trying to get her to come to and she wouldn't.  She—she stopped.  And so I started doing CPR and then realized—then I realized I should call 911.  So I called 911.  And then she came back and then . . . . "  Fire Captain Steven Bixler asked Ditto, "Was she talking to you?"  Ditto replied that Karina was "like mumbling."

McQueen testified, "just by looking at [Karina] I could tell it was going to be more than a fall. . . . it looked like we were going to be dealing with a CPR."  McQueen continued, "[N]ormally, with falls—or at least in my experiences with the falls I've seen,

3

the patient is usually alert and talking to us. If they're not, they may be in an altered state where they're a little bit confused, but this is the first time I've seen a fall that resulted directly in a patient going into CPR status." McQueen noted, "I've never seen a fall that resulted directly in asystole. Based on that cardiac rhythm, that's a completely dead heart. Especially with the lack of respirations, the patient is completely dead. [¶] We don't even see that on [victims of] car accidents. For me personally that raised a red flag with a fall from a stairs, without [the victim having] any prior heart history or prior medical problems."

McQueen conducted a rapid trauma assessment of Karina. He testified this case was unusual in that, "there was just blood everywhere. There was no active bleeding that we saw, but there was a lot of blood. We couldn't tell where it was coming from, even on the rapid exam." Another paramedic, Timothy Olson, examined Karina and concluded based in part on her eyes, which were fixed and dilated, that she had lost oxygen to the head for longer than six minutes. The prosecutor asked Olson, "The time frame that you were given by Mr. Ditto, did that coincide with the . . . different factors that you noted, being fixed pupils, the dried blood, lack of active bleeding and the coagulation of the blood?" Olson answered in the negative, explaining: "Based on the fact that she did have the asystole and the fixed and dilated pupils, for a heart to go into a lethal rhythm, you're looking at six to seven minutes before you start developing brain damage. [¶] As those pupils were dilated and she was already in asystole, where the heart was in a nonviable rhythm, there was nothing—we couldn't even electrically change her heart rate. We had to mechanically pump her chest and give her a medication that would increase

4

her electrical ability of the heart. [¶] So you're looking at six to seven minutes just for the brain and the body to start going hypoxic."

Captain Bixler started to do compressions on Karina shortly upon their arrival at the residence. Additionally, paramedics gave Karina medication intravenously and supplied her with oxygen. After approximately nine minutes, and just as paramedics were about to declare Karina legally and clinically dead, her heart resumed beating, but not "to the point where it was producing a pulse with perfusion or blood." Paramedics removed Karina from the floor and put her in an ambulance. McQueen observed that the blood underneath her body had formed "like a wavy pattern." McQueen testified, "From my experience, in terms of what we've seen, it would—with the swish marks, the way the blood was, it indicated movement." Paramedics took Karina to the hospital. McQueen stated, "From the time that we were on the scene to the time we offloaded at the hospital, [Karina] never maintained respirations or restored any of her own respirations. That was unusual."

McQueen saw no indications Ditto had performed CPR on Karina. Specifically, although all of the first responders who had performed CPR on Karina had gotten both of their hands bloodied from the amount of blood on Karina's shirt, only one of Ditto's hands was bloodied; Karina's clothing did not appear to have been moved from her having received CPR; and Ditto appeared calm and not out of breath from having exerted energy performing CPR.

Lisa Marie Challender, a firefighter and paramedic, was asked at trial if there were any discrepancies between what she had seen when examining Karina at the residence

5

and what Ditto had reported to paramedics. Challender responded in the affirmative. Challender disagreed with Ditto's statement that Karina had been down for two minutes, noting: "The blood was drier than I would have assumed at two minutes. She was cooler in temperature than I would have assumed for somebody that had had a pulse two minutes before that. [¶] The asystole was really concerning and the fact that it took us so many minutes to get [her pulse] back. A young heart can usually come back quicker. So that meant, to me, there was more of a downtime." Challender clarified that the term downtime "just means a long time without oxygen."

Challender questioned Ditto's account of the fall: "Generally, when people fall, they have unilateral, which means one side—one side injuries, if they fall to the ground. [Karina] had bilateral injuries, but she also had injuries anterior and posterior. [¶] And so for somebody to have . . . fallen onto the tile surface, how come she was injured on both sides of her face and then the back of her head also? [¶] That—that didn't make sense to me." In the ambulance, Challender had detected a sweet odor coming from Karina. After talking to a trauma surgeon, Challender realized the odor was lactic acidosis, indicating Karina's body had been deprived of oxygen "for a while."

Captain Bixler stayed at the house and interviewed Ditto, who had fresh scratches on his face and neck, and blood on his arm. Ditto stated the scratches and blood on his body must have resulted from his doing CPR on Karina. Captain Bixler pondered "what actually happened," reasoning that someone receiving CPR lacks a pulse and is "unable to fight back." The first responders became "suspicious" because Ditto's account of the incident was "not adding up"; therefore, they called police.

San Diego Police Officer Ivan Sablan interviewed Ditto at the crime scene that morning. Officer Sablan testified: "To see the scratches [on Ditto] and to see the condition of Mrs. Ditto, it just kind of—I just didn't feel right about the whole thing, but I didn't really know how much I had there. [¶] So I let [another police officer], who also was responding to the scene—just kind of let him know what I had seen. [¶] And so he had kind of felt the same way about the whole situation. So he called the domestic violence on-call sergeant, just to see—you know, let him know what we had at the time." Officer Sablan examined the stairway but did not see any pictures or other objects out of place. Moreover, he did not notice any blood on the carpeting or on the walls, or scuff marks or dents on the walls. At around 3:40 a.m. that day, a detective expert regarding domestic violence arrived at the Ditto residence to investigate further.

Dr. Yoo examined Karina at the hospital and stated that the CT scan showed that all parts of her brain were swollen. Karina also had signs of external head injury, including a very large scalp hematoma, and a laceration to the back of her head. Dr. Yoo considered it unlikely that Karina's external injuries related to her internal injuries, explaining: "The scalp hematoma was just in the right frontal area. And it is difficult to get global, total brain edema with just a one-sided—or one part of the head being hurt that way. So it just wasn't a consistent picture." Dr. Yoo consulted with Dr. Imad Dandan, a trauma surgeon, and they both believed "the scalp hematoma or the laceration to the back of [Karina's] head just didn't explain, again, the global diffuse cerebral edema. [¶] [They] felt it was most likely something else that happened after she fell and hit her head that led her to have oxygen deprivation of the brain that gave her the diffuse

7

cerebral edema."  Dr. Yoo testified he had diagnosed Karina as clinically brain dead, and having suffered anoxic injury to the brain, meaning a loss of blood flow and oxygen to the brain.  Dr. Yoo noted, "If this anoxic brain injury is just what we suspect, then there was some—some event that caused [Karina] to lose the ability to breathe and get oxygen to the brain.  So our suspicion is it occurred in a very rapid fashion at the time of the trauma that took place.  To Dr. Yoo, Karina's injuries were consistent with strangulation.

Dr. Dandan treated Karina within 20 minutes of her arrival at the hospital.  Her toxicology test showed she had no alcohol or drugs in her system.  She had "normal vital signs with good pulses," but she had significant acidosis, which is produced when the body lacks sufficient oxygen circulating through the tissues.  Based on a CT scan, Dr. Dandan concluded, "We did not find any injury to the brain itself, but there was significant amount of swelling to the brain, which was consistent with the lack of oxygen to the brain for a relatively prolonged time."  He further concluded, "there was no primary brain injury or primary cervical spine injury that led to [Karina's] cardiac arrest."  Karina had a fracture on the first rib, which would have required "quite a bit of force" to fracture.  Dr. Dandan testified:  "Usually we see that [kind of injury] with falls from extreme heights or major car accidents."  Dr. Dandan testified Karina's brain injuries could have been caused by strangulation.  On cross-examination, Dr. Dandan agreed that a fall could have caused the laceration found on the back of Karina's head.  Asked whether a fall could have caused Karina's heart rhythm malfunction, Dr. Dandan replied in the negative:  "Diffuse axonal injury does not cause that kind of heart effect.  The kind of trauma to the brain that causes the heart to stop has to be what we call a mass lesion,

8

something that is pushing on the brain from one side to the other, causing a midline shift, kinking the brain stem, thus stopping the breathing, thus stopping the heart." Dr. Dandan explained that "diffuse axonal injury . . . causes separation between what's known as the gray matter and the white matter. So although the neurons are still functional and alive, the communication between the parts of the brain is not there anymore." Over a period extending beyond four or five days, that injury could cause death.

Cardiologist Craig Sclar examined Karina in the hospital and concluded based on tests administered to her that she had a normal heart and no cardiac pathology; therefore, a heart attack did not cause her heart to stop beating. Dr. Sclar was asked on redirect examination, "The condition that you saw Miss Karina Ditto in when you treated her, was she in a condition consistent with a fall down the stairs?" He replied that after examining Karina, he had asked himself, "How does falling down the stairs cause you to come in essentially brain dead? I just—personally, I didn't understand that."

Nurse Stephanie Hanifan worked in the hospital's surgical intensive care unit and testified that on March 14, 2011, she conducted a head-to-toe assessment of Karina: "[Karina] had a lot of bruising. I wasn't really expecting that. And so I—she had a lot of bruising over her body. It was almost hard to document all of it because there was just— it was pretty extensive." Specifically, Karina had bruises on her forehead, eye, lip, mouth, face, clavicle, chest, right arm, hands, right leg and upper thigh, shin and ankle, and right back shoulder. She also had a chin wound and a laceration on the back of her head. Nurse Hanifan testified she had difficulty opening Karina's swollen eyes in order to check her pupils. Nurse Hanifan added, "I didn't think that [Karina's] bruising and just

9

the injuries matched to [*sic*] the report that I got.  And, to me, it looked like she had been beaten."  Nurse Hanifan observed scratches on Ditto's face and neck but noted that later that day Ditto had buttoned his shirt completely, thus covering the scratches on his neck.  Nurse Hanifan testified, "I thought maybe—I thought he was trying to cover the scratches on his neck."

Dr. Othon Mena performed an autopsy on Karina and concluded she had died from "post-arrest hypoxic ischemic encephalopathy due to asphyxia with neck compression and blunt trauma."[4]  He further concluded the manner of death was homicide.  Dr. Mena explained:  "The injuries that are consistent with strangulation are the hemorrhages of the neck near the thyroid gland, the ones in the back of the neck.  And then also  the—all those petechial hemorrhages around the eyes and the eyelids."  Dr. Mena pointed out that the blunt force injuries to Karina's head and body were survivable; therefore, her strangulation made the difference in causing her death.  He stated that generally someone can suffer permanent brain damage from being strangled for approximately three to five minutes.  Dr. Mena concluded that Karina had suffered some

---

[4]     Dr. Mena explained the different components of that cause of death:  " 'post-arrest' . . . means that the person has had a cardiopulmonary arrest.  So they stop breathing.  They've stopped having a heartbeat.  And then this caused brain injury, which is the 'encephalopathy' part.  [¶]  And the 'hypoxic ischemic' part means that the brain injury was because there was not enough oxygen or not enough blood flow or both."  Dr. Mena stated "asphyxia with neck compression and blunt trauma" means "there's blunt trauma to the body, as with all the injuries that we found all over [Karina].  . . .  [¶]  And it means that there had been asphyxia, meaning that the body has not gotten enough oxygen or it was not able to use oxygen or it was not able to get rid of carbon dioxide."  By the term "neck compression," Dr. Mena meant to encompass all methods of asphyxia, including strangulation, smothering, and also blunt trauma.

defensive injuries on her arms, shins, thigh, back and face. In reaching that conclusion, he took into account the scratches observed on Ditto's face and neck. Dr. Mena was aware from Karina's medical files that at the hospital Karina's subclavian vein had been punctured, causing bleeding. However, he concluded that injury had not caused her death.

The People also presented evidence indicating Ditto's possible motive for killing Karina: Having had marital problems in the past, they had considered divorce; Ditto was jealous, and knew that in the months before her death, one of Karina's male coworkers had commented favorably on a photograph she had posted on a social website; the coworker had sent Karina a nude photograph of a male, and Karina had sent that coworker a picture of herself in which she appeared partially undressed; Ditto had recently bought an insurance policy covering accidental death and dismemberment for himself and his family. Karina was insured for $150,000.

*Defense Case*

Ditto testified regarding the events leading to Karina's injuries. Specifically, he and Karina had been watching television, and she went to use an upstairs bathroom. Ditto heard her fall down the stairs. She was not moving or breathing; therefore, he performed CPR on her. She responded by moving her arms and head, and grabbed her head, moving it from side to side. She grabbed at Ditto, tried to speak, but made no sound. She soon stopped moving. Ditto called 911 and returned to try to wake up Karina, but he was unable to do so. Paramedics arrived shortly afterwards.

11

On direct examination, Ditto denied he did the following to Karina: "kick[ed] her in the forehead so hard that it caused a huge bruise that caused swelling to her forehead;" or "stomp[ed] on her back so hard that [he] fractured her first rib"; or "stomp[ed] on her leg so hard that it left a pattern bruise that showed up three days later"; or "wrap[ped] [his] hands around her throat and squeeze for five minutes, until the life drained out of her."

Defense expert pathologist Dr. Michael Baden reviewed Karina's hospital records and the autopsy conducted by Dr. Mena. Dr. Baden found "no evidence [Karina] died of strangulation." Instead, Dr. Baden concluded Karina "died of traumatic brain injury consistent with the fall that was described by [Ditto], but she died of brain damage." In ruling out death by strangulation, Dr. Baden reviewed reports that Karina had hemorrhaged in the vicinity of her right collar bone. Dr. Baden asserted he "look[ed] at the possibility of compression of the neck. But as shown in some of the photographs that Dr. Mena took, the hemorrhage is in the wrong place for strangulation and it's too much for strangulation, and it's consistent with hemorrhage from mistaken puncture of the subclavian artery by one of the residents." Dr. Baden elaborated on cross examination: "I take everything into consideration, that there was no marks on the neck of strangulation, that—you know, from the skin, that there were no injuries to the hyoid bone or thyroid cartilage and that the blood around the trachea and thyroid gland comes from the subclavian artery puncture and not from neck compression. So I saw no evidence for strangulation, manual strangulation."

12

DISCUSSION

I.

We have reviewed the record and we agree with the People that Ditto proffered no evidence that Karina's heart was beating when paramedics arrived at the residence. The only admitted testimony on that topic was provided by paramedics and firefighters who testified Karina did not have a pulse when they arrived at the residence. We reject Ditto's contention the record is unclear whether defense counsel proffered any contrary evidence. The record could not be clearer—he did not.

To the extent Ditto raises an ineffective assistance of counsel claim in connection with this argument, we follow the California Supreme Court's admonition: "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citation.] '. . . "[t]o promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representation should join a verified petition for writ of habeas corpus." ' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Ditto is not barred from pursuing this matter in a habeas petition.

13

At the close of the evidence phase of trial, defense counsel moved to admit into evidence four medical documents containing references to Karina's body temperature at the hospital. Asserting the records were subpoenaed from Karina's certified medical file, and thus presented no authenticity issues, defense counsel argued: "The relevance to those records [*sic*] is there's a reference to the fact that [Karina] was hypothermic upon her admission to the emergency room. I don't have a sense that what—the significance of that has been adequately explained thus far. [¶] [¶] My argument is that, in fact, they simply forgot to take her temperature, for whatever reason. And by the time the hypothermia protocols had been instituted and they recorded her temperature, they just went back and filled in that temperature because they didn't have any other one. And that's the temperature that wound up in the emergency report."

The prosecutor countered: "Dr. Dandan testified that [Karina] was hypothermic when she arrived. Paramedics also testified that she was hypothermic when they arrived."

The court denied the motion: "I don't think the documents are going to come in because they're just—it's not just about temperature. . . . First of all, the handwriting is . . . I'm not sure I can decipher it. So it's clearly confusing. [¶] The summary of the emergency room . . . includes a lot of medical terms, some of which were talked about and some of which we have no definitions of. [¶] So far as exhibit [Nos.] 108, 109, 110 and 111 are concerned, under [Evidence Code section] 352, I'm not going to allow them. I just think it's really confusing to the jury." Nonetheless, the court permitted the defense

14

to argue Karina's purported hypothermia to the jury. At that point, defense counsel conceded the medical documents had not been properly authenticated by a witness: "Right. I need to argue it. And we just didn't have a witness to authenticate those particular records because we never got to that." At a subsequent hearing, Ditto renewed his motion to admit the documents. The court modified its ruling on one exhibit but excluded the rest: "[Exhibit Nos.] 109, 110 and 111 are excluded on the basis that they're cumulative and under [Evidence Code section] 352." The court admitted exhibit No. 108 into evidence and again permitted defense counsel to argue about its importance to the jury.

With respect to the medical documents that the trial record shows Ditto actually offered into evidence, he contends that the court erred in excluding medical documents showing "Karina was not cold at her house nor 'hypothermic' when brought to the hospital." (Capitalization omitted.) He argues that those documents that the trial court excluded from evidence showed that 35 minutes before Karina's temperature was first taken at the hospital, she had received a "hypothermia protocol" to reduce her temperature for the purpose of improving her brain function. He also maintains that the exclusion of the evidence violated his state and federal rights to due process and to confront witnesses.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) We do not disturb the ruling unless it falls outside the bounds of reason. (*People v.* Williams (1998) 17 Cal.4th 148, 162.) No such abuse occurred here. The trial court carefully evaluated Ditto's request to

15

admit the documents, and based its refusal to do so on the applicable law—in particular Evidence Code section 352—finding that the medical records were cumulative and confusing to the jury. We also note that in excluding the medical documents, the court likely considered the fact they were unauthenticated. Defense counsel conceded as much when he noted that he had not obtained a witness to authenticate the documents. We reject Ditto's claim the court's error was of constitutional dimension. The application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution. (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

III.

Ditto contends the trial court erred by allowing the paramedics and nurses to "give medical opinions as to cause and time of death and personal opinions that [he] was a liar and guilty of a crime." Ditto argues that to the extent his counsel failed to object at trial and thus preserve the issue for appeal, Ditto received ineffective assistance of counsel. Ditto does not specify which of the witnesses' statements were unobjected to or what prejudice he suffered in light of the entire record. Instead, he states that "to the extent that additional materials are necessary to support this issue, it will also be raised in a Writ of Habeas Corpus to be filed in this case."

The paramedics, firefighters and nurses testified as percipient witnesses and relayed what they observed regarding Karina's medical condition, in light of their experience with other victims of falls. This was well within the scope of testimony permitted under Evidence Code section 800. "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear

16

understanding of his testimony." (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) The testimony of the paramedics and nurses regarding Ditto's behavior and demeanor from their personal observations of him at the home and at the hospital was not unduly prejudicial. (Accord, *People v. Virgil* (2011) 51 Cal.4th 1210, 1254 ["The challenged testimony was based on the detective's perceptions and was helpful for the jury to understand how [the detective] came to suspect defendant was connected to [a] homicide."])

We reject Ditto's claim that unspecified witnesses provided "personal opinions that [he] was a liar and guilty of a crime." (Capitalization omitted.) Ditto's argument, in effect, is that the paramedics and nurses' testimony contradicted his testimony that Karina had fallen; and therefore, by implication, they had testified he had lied and was guilty of the crime. We have reviewed the challenged testimony and find no instance where the paramedics or nurses provided testimony that was prejudicial or unhelpful to the jury's decision making, or that violated the general rule set forth in *People v. Chatman* (2006) 38 Cal.4th 344: "Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*Id.* at p. 397.)

There is no question that the testimony of the paramedics and medical personnel was at odds with Ditto's account of what occurred. But it is the purview of the jury to resolve conflicts in the evidence and decide issues of credibility. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Here, the record contains overwhelming evidence to support the jury's verdict and we see no reason to disturb the jury's finding of guilt.

17

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.